PEOPLE v RENNO

OPINION OF THE COURT

1. CRIMINAL LAW—DEFENDANT TESTIFYING—PRIOR CONVICTIONS—IM-
PEACHMENT—CREDIBILITY—CROSS-EXAMINATION—ORDINANCE
CONVICTIONS.

Convictions used by the prosecutor to impeach defendant's credi-
bility were used in violation of what historically has been
Michigan's rule on impeachment by conviction where the prose-
cutor during cross-examination inquired into the unsubstanti-
ated details of defendant's prior municipal ordinance convic-
tions and repeatedly questioned the defendant regarding these
details after the defendant repeatedly denied them.

2. WITNESSES—DISQUALIFICATION—IMPEACHMENT—PRIOR CONVICTIONS
—STATUTES.

The original legislative purpose behind statutes, bearing on the
propriety of impeaching a witness by prior convictions, was to
allow persons, historically disqualified at common law from
testifying in a case, to testify; however, a compromise was
worked out whereby these disqualified persons could still have
their credibility attacked by those prior convictions *which
formerly had disqualified them from testifying* (MCLA
600.2158, 600.2159).

3. WITNESSES—DISQUALIFICATION—INFAMOUS CRIMES—CRIMINAL LAW
—COMMON LAW—STATUTES—IMPEACHMENT.

Not all crimes at common law disqualified a witness from testify-

REFERENCES FOR POINTS IN HEADNOTES
[1, 2, 11] 21 Am Jur 2d, Criminal Law §§ 358, 368.
[3] 21 Am Jur 2d, Criminal Law § 23.
[4, 5] 58 Am Jur, Witnesses §§ 707, 723, 724.
[6] 40 Am Jur 2d, Homicide §§ 542, 543.
[7] 40 Am Jur 2d, Homicide §§ 54, 70.
[8, 9] 40 Am Jur 2d, Homicide §§ 54, 227, 247, 438, 500.
[10] 40 Am Jur 2d, HOmicide §§ 145, 151.
[12] 54 Am Jur 2d, Military and Civil Defense § 252.
[13] 58 Am Jur, Witnesses § 860 *et seq.*
[14] 40 Am Jur 2d, Homicide §§ 44, 53, 558.
[15] 21 Am Jur 2d, Criminal Law § 311.
[16] 21 Am Jur 2d, Criminal Law §§ 333, 343.

ing; only *infamous* crimes disqualified a witness, and Michigan's statutes were originally intended only to allow impeachment by use of that type of criminal conviction.

4. CRIMINAL LAW—ORDINANCE CONVICTIONS—MISDEMEANOR CONVICTIONS—WITNESSES—IMPEACHMENT—PRIOR CONVICTIONS—STATUTES.

Use of municipal ordinance or misdemeanor convictions used by the prosecution *solely for impeachment purposes* is prohibited; this type of conviction was never intended by Michigan's Legislature to fall within the confines of statutes bearing on the propriety of impeaching a witness by prior convictions; these statutes were passed to give rights to an accused defendant, not to take rights away from him; allowing the use of municipal ordinance convictions does just that—it takes away rights the accused formerly had at common law (MCLA 600.2158, 600.2159).

5. CRIMINAL LAW—WITNESSES—IMPEACHMENT—STATUTES— MOTIVE—INTENT—MISTAKE—ACCIDENT—SCHEME—PLAN—SYSTEM—EVIDENCE.

Even if particular convictions are not admissible for impeachment purposes, if the factual basis behind these convictions falls within the confines of the statute providing that "[i]n any criminal case where the defendant's motive, intent, the absence of, mistake or accident on his part, or the defendant's scheme, plan or system in doing an act, is material, any like acts or other acts of the defendant which may tend to show his motive, intent, the absence of, mistake or accident on his part, or the defendant's scheme, plan or system in doing the act, in question, may be proved, whether they are contemporaneous with or prior or subsequent thereto; notwithstanding that such proof may show or tend to show the commission of another or prior or subsequent crime by the defendant", they may be introduced by the prosecution as substantive evidence (MCLA 768.27).

6. HOMICIDE—VERDICTS—SECOND-DEGREE MURDER—MANSLAUGHTER—BRAWL.

Trial judge was correct in his conclusion that the facts of a case support only three possible verdicts, (1) second-degree murder, (2) manslaughter, (3) not guilty, where defendant was involved in a barroom brawl, one of the parties to the altercation died as a result of injuries received in the fracas, and the only possible way the decedent died, from the evidence presented, was by being struck severely over the head with a large, flat object, a chair.

7. HOMICIDE—MANSLAUGHTER—VOLUNTARY MANSLAUGHTER—INVOL-
UNTARY MANSLAUGHTER.

The crime of manslaughter is in actuality composed of two
separate and distinct crimes, with differing elements, *i.e.,* vol-
untary manslaughter and involuntary manslaughter.

8. HOMICIDE—MANSLAUGHTER—VOLUNTARY MANSLAUGHTER—PROVO-
CATION—PASSION—MURDER—MALICE.

Voluntary manslaughter requires that a defendant be found to
have an intent to kill or an intent to do serious bodily harm to
the deceased and to this extent the offense parallels the crime
of murder but it is distinguished from murder by an absence of
malice; to reduce a homicide to voluntary manslaughter the
fact finder must determine from an examination of all the
circumstances surrounding the killing that malice was negated
by provocation and the homicide committed in the heat of
passion.

9. HOMICIDE—MANSLAUGHTER—INVOLUNTARY MANSLAUGHTER—MAL-
ICE—INTENT—NEGLIGENCE.

Involuntary manslaughter is the killing of another without mal-
ice and *unintentionally,* but in doing some unlawful act not
amounting to a felony nor naturally tending to cause death or
great bodily harm, or in negligently doing some act lawful in
itself, or by the negligent omission to perform a legal duty.

10. HOMICIDE—MANSLAUGHTER—VOLUNTARY MANSLAUGHTER—PRIOR
ACTIONS—BRAWL—SELF-DEFENSE.

On the issue of voluntary manslaughter, prior actions of defend-
ant of being drunk and disorderly, fighting, and supposedly, on
one occasion, beating his wife are inadmissible where defendant
was involved in a barroom brawl, one of the parties to the
altercation died as a result of injuries received in the fracas, no
claim of accident or mistake was made, and no instruction on
these issues was given by the court to the jury, it was not
claimed, nor was any evidence introduced to the contrary, that
the decedent met his death accidentally, there was no testi-
mony that he possibly was killed by striking his head against
some hard object, the only possible way the decedent died, from
the evidence presented, was by being struck severely over the
head with a large, flat object, a chair; these prior actions are
also irrelevant on the question of whether or not the defendant
acted out of malice or rather as a result of adequate provoca-
tion and in the heat of passion.

11. CRIMINAL LAW—DEFENDANT TESTIFYING—CROSS-EXAMINATION—
PRIOR CONVICTIONS—APPEAL AND ERROR.

Prosecutor's inquiry on cross-examination of defendant into the
factual basis behind defendant's prior guilty plea to a drunk
and disorderly charge falls within a decision of the Michigan
Supreme Court that in the examination or cross-examination of
any witness, no inquiry may be made regarding prior arrests or
charges against such witness which did not result in conviction
and neither may such witness be examined with reference to
higher original charges which have not resulted in conviction,
whether by plea or trial; due to the extremely prejudicial effect
this evidence had on the defendant its use constituted reversi-
ble error.

12. CRIMINAL LAW—IMPEACHMENT—NONJUDICIAL MILITARY PUNISH-
MENT—PREJUDICE.

Nonjudicial military punishment pursuant to Article 15 of the
Uniform Code of Military Justice is informal; therefore, the
probative value of such actions is outweighed by their potential
for prejudice, and reference to Article 15 actions for impeach-
ment purposes is legally impermissible.

13. CRIMINAL LAW—DISTRICT AND PROSECUTING ATTORNEYS—ARGU-
MENT—JURY—WITNESSES—EXPERT WITNESSES—CREDIBILITY—
APPEAL AND ERROR.

Prosecutor's closing argument that "[t]here was no other testi-
mony from any source" as to the cause of death "and you,
therefore, must believe the testimony of the Doctor in this
regard" is clearly incorrect; such argument is error and may
amount to reversible error in an appropriate situation; the jury
is the sole judge of the credibility of the witnesses and they
may give whatever weight to any particular testimony they
desire; they may also discount that testimony or disregard it if
they feel the doctor is not credible; they do not "have to
believe" his testimony solely because he is the only expert that
testifies.

14. CRIMINAL LAW—NEW TRIAL—APPEAL AND ERROR—SECOND-DE-
GREE MURDER—MANSLAUGHTER

Case remanded for a new trial where due to the numerous errors
committed in the trial of the case, some reversible error and
some questionable reversible error, but all of them prejudicial
to the defendant tried for second-degree murder and convicted
of manslaughter, the Michigan Supreme Court does not feel
that justice has been done in this particular case (MCLA 770.1).

DISSENTING OPINION

M. S. COLEMAN, J.

15. CRIMINAL LAW—CROSS-EXAMINATION—DEFENDANT TESTIFYING—
PRIOR CONVICTIONS—INSTRUCTIONS.

*Cross-examination of a defendant charged with a crime, while
unnecessarily repetitive as to alleged wife beating, does not
mandate reversal where defendant's witness characterized him
as "very nice", as "very quiet", as never being "inebriated" or
"excited", defendant gave vague and misleading testimony
regarding the duration and frequency of his prior criminal
misconduct, the prosecutor's examination sought to clarify the
testimony and the jury was properly instructed regarding their
use of information regarding prior convictions.*

16. CRIMINAL LAW—CROSS-EXAMINATION—CHARACTER—REPUTATION.

*Prosecutor had a right to cross-examine and rebut as to issues of
character and reputation for peacefulness where, on direct
examination, defendant put his character and reputation for
peacefulness into issue.*

Appeal from Court of Appeals, Division 2, Bron-
son, P. J., and Fitzgerald and O'Hara, JJ., affirm-
ing St. Clair, Stanley C. Schlee, J. Submitted May
7, 1974. (No. 2 May Term 1974, Docket No. 54,826.)
Decided June 25, 1974.

46 Mich App 156 reversed.

Gary C. Renno was convicted of manslaughter.
Defendant appealed to the Court of Appeals. Af-
firmed. Defendant appeals. Reversed and re-
manded for a new trial.

*Frank J. Kelley,* Attorney General, *Robert A.
Derengoski,* Solicitor General, *Peter E. Deegan,*
Prosecuting Attorney, and *Peter R. George,* Chief
Appellate Attorney, for the people.

*State Appellate Defender Office* (by *Stuart M.
Israel),* for defendant on appeal.

T. M. Kavanagh, C. J. This case is before us on
leave granted from a decision of the Court of
Appeals, 46 Mich App 156; 207 NW2d 463 (1973)
affirming defendant's jury conviction of man-
slaughter.

Defendant was involved in a barroom brawl, and
one of the parties to the altercation died as a
result of injuries received in the fracas. He was
tried for second-degree murder and convicted of
manslaughter. His defense was two-pronged: (1)
that his actions were lacking the necessary ele-
ment of malice to support a murder conviction and
(2) that he personally did not inflict the fatal blow
to the deceased.

Defendant raises four issues on appeal, three of
which go to the cross-examination of him by the
prosecutor during the trial.

## ISSUES 1 and 2

Defendant argues that it was reversible error for
the prosecutor during cross-examination to inquire
into the unsubstantiated details of defendant's
prior municipal ordinance convictions and to re-
peatedly question the defendant regarding these
details after the defendant repeatedly denied
them.

During direct examination, defendant testified
that he previously had been convicted of a few
drunk charges and one drunk and disorderly
charge.

On cross-examination the prosecutor, through
his questioning, repeatedly tried to show that the
drunk and disorderly charge defendant pled guilty
to involved a fight defendant had with his wife in
which he beat her up. Defendant denied this re-
peatedly and moved for a mistrial on the grounds

that such conduct by the prosecutor deprived defendant of a fair trial and was improper.

In response to the defendant's motion for a mistrial, the prosecutor argued that such evidence, *i.e.,* that defendant was arrested and charged with beating his wife and then pled guilty to drunk and disorderly, was admissible evidence under the provisions of MCLA 768.27; MSA 28.1050. This statute provides:

"Sec. 27. In any criminal case where the defendant's motive, intent, the absence of, mistake or accident on his part, or the defendant's scheme, plan or system in doing an act, is material, any like acts or other acts of the defendant which may tend to show his motive, intent, the absence of, mistake or accident on his part, or the defendant's scheme, plan or system in doing the act, in question, may be proved, whether they are contemporaneous with or prior or subsequent thereto; notwithstanding that such proof may show or tend to show the commission of another or prior or subsequent crime by the defendant."

The trial judge did not rule on this motion but instead instructed the jury that these convictions could be assessed by the jury in evaluating the defendant's credibility. Ruling that they were proper for impeachment purposes, the trial judge denied defendant's motion for a mistrial.

In *People v Jackson,* 391 Mich 323; 217 NW2d 22 (1974), several members of this Court expressed their views regarding the appropriateness of allowing the impeachment of the defendant by use of his prior convictions. The nature of and the extent of any rule which this Court may devise in this area is still not settled. In this case, however, this Court is of the opinion that the convictions used by the prosecutor to impeach this defendant's credibility were used in violation of what histori-

cally has been our rule on impeachment by conviction.

This state has two statutes bearing on the propriety of impeaching a witness by prior convictions. The first, MCLA 600.2158; MSA 27A.2158 was originally enacted in 1861 as 1861 PA 125. It reads in part:

"No person shall be excluded from giving evidence on any matter, civil or criminal, by reason of crime or for any interest of such person * * * ; but such interest, * * * or conviction of crime, may be shown for the purpose of drawing in question the credibility of such witness, * * * ."

In 1867 this Court spoke on impeachment by conviction in *Wilbur v Flood,* 16 Mich 40 (1867). There Justice CAMPBELL states, p 44:

"The rules of law do not allow specific acts of misconduct, or specific facts of a disgraceful character, to be proved against a witness by others. He may be proved by record evidence to have been *convicted of infamous crimes,* but not to have done other infamous deeds, nor to have undergone personal disgrace." (Emphasis added.)

In 1881, MCLA 600.2159; MSA 27A.2159 was passed as 1881 PA 245. This statute reads in part:

"No person shall be disqualified as a witness in any civil or criminal case or proceeding by reason of his interest in the event of the same as a party or otherwise or by reason of his having been convicted of any crime; but such interest or conviction may be shown for the purpose of affecting his credibility."

In 1882, this Court, speaking through Justice CAMPBELL, had reason to address themselves to the purposes of the above statutes. In *People v Hall,*

48 Mich 482, 489–490; 12 NW 665 (1882) this Court
stated:

"We think also that it would have been highly proper
that the court should, when requested, have called the
attention of the jury to Hickey's position as affecting
his credit. Formerly he could not have been sworn at
all. The statute did not abrogate entirely the effect of
*conviction of an infamous crime* on a witness, but still
allows it to be shown as a distinct fact bearing on his
credibility. Comp. L. § 5966." (Emphasis added.)

The original legislative purpose behind these
statutes is obvious. They were passed to allow
persons, historically disqualified at common law
from testifying in a case, to testify. A compromise,
however, was worked out whereby these disquali-
fied persons could still have their credibility at-
tacked by those prior convictions *which formerly
had disqualified them from testifying.*

Not all crimes at common law disqualified a
witness. Only *infamous* crimes disqualified a wit-
ness, and our statutes were originally intended
only to allow impeachment by use of that type of
criminal conviction. This distinction was pointed
out in 1889 by this Court in *People v Hanrahan,*
75 Mich 611, 620–621; 42 NW 1124 (1889) when it
stated:

"It rests in the sound discretion of the Legislature to
determine to what extent they will give to municipal
courts authority to punish offenders. But whatever
authority is delegated to municipalities to legislate
upon the subject of offenses, and to prescribe within
certain limits the punishment to be inflicted therefor, it
is clear that the constitutional rights of the accused
must be protected and preserved in everything that is
done, as fully as if the prosecution was for a crime
under the general laws of the State. In cases where, on
account of the nature of the punishment which may be

inflicted, it is classed as *infamous* every constitutional safeguard must be preserved to the accused. He cannot be denied the right of trial by jury; to be informed of the nature of the accusation; to be confronted with the witnesses against him, etc. In short, the proceedings against him must be by due process of law.

"What punishments are considered as infamous are pointed out by Mr. Justice Gray. in *Ex parte Wilson,* 114 U.S. 417 (5 Sup. Ct. Rep. 935) [29 L Ed 89 (1885)]."

Turning to Mr. Justice Gray's definition of an infamous crime in *Wilson, supra,* pp 422–423, we find:

"Mr. William Eden (afterward Lord Auckland) in his Principles of Penal Law, which passed through three editions in England and at least one in Ireland within six years before the Declaration of Independence, observed, 'There are two kinds of infamy; the one founded in the opinions of the people respecting the mode of punishment; the other in the construction of law respecting the future credibility of the delinquent.' Eden's Principles of Penal Law, ch 7, § 5.

"At that time, it was already established law, that the infamy which disqualified a convict to be a witness depended upon the character of his crime, and not upon the nature of his punishment. *Pendock v McKinder,* Willes, 665 [95 Eng Rep 662 (1775)]; Gilb. Ev. 143; 2 Hawk. ch 46, § 102; *The King v Priddle,* 1 Leach (4th ed) 442 [168 Eng Rep 323 (1787)]. The disqualification to testify appears to have been limited to those adjudged guilty of treason, felony, forgery, and crimes injuriously affecting by falsehood and fraud the administration of justice, such as perjury, subornation of perjury, suppression of testimony by bribery, conspiring to accuse one of crime, or to procure the absence of a witness; and not to have been extended to cases of private cheats, such as the obtaining of goods by false pretenses, or the uttering of counterfeit coin or forged securities. 1 Greenl. Ev. § 373; *Utley v Merrick,* [52 Mass] 11 Met. 302 [1846]; *Fox v Ohio* [46 US] 5 How. 410, 433, 434 [12 L Ed 213 (1847)].

"But the object and the very terms of the provision in the Fifth Amendment show that incompetency to be a witness is not the only test of its application."

Defendant in this case was impeached by the prosecutor's use of his prior municipal ordinance violations and convictions. As set forth in *Hanrahan, supra,* and *Wilson, supra,* these are not the type of crimes which historically would have disqualified a witness from testifying. Our Legislature saw fit to pass these statutes and to confer upon the accused a right he previously did not have at common law, that of testifying on his own behalf. The Legislature also saw fit to limit this right, permitting the defendant's credibility to be attacked in the discretion of the trial court by these prior disqualifying convictions. These statutes were passed to give rights to an accused defendant, not to take rights away from him. Allowing the use of municipal ordinance convictions for impeachment purposes does just that—it takes away rights the accused formerly had at common law.

We do not hesitate in this case to prohibit the further use of municipal ordinance or misdemeanor convictions used by the prosecution *solely for impeachment purposes.* This type of conviction was never intended by our Legislature to fall within the confines of MCLA 600.2158; MSA 27A.2158, or MCLA 600.2159; MSA 27A.2159. This is affirmatively shown by the legislative history of these statutes. It is time that this Court brings our current interpretation of these statutes back in line with their original purposes.

As we noted above, MCLA 768.27; MSA 28.1050, permits the prosecutor to introduce into evidence any prior acts of the accused which are, within the statutory guidelines, relevant and material to the instant prosecution. Although the trial judge did

not rule on the prosecutor's argument that these particular municipal ordinance violations were admissible under the statute, we feel that this Court should address itself to the issue since, as shown below, a new trial will be required in this case.

The prosecutor is correct in his argument that, even if particular convictions are not admissible for impeachment purposes, if the factual basis behind these convictions falls within the confines of MCLA 768.27; MSA 28.1050, they may be introduced by the prosecution as substantive evidence.

However, in the instant case, the prosecutor argues that such actions by the defendant are admissible as they go to show the "absence of mistake or accident" on his part in this transaction. He supports his theory by stating in his brief "[t]he only way to rebut the inference of accidental killing that had been presented by the defense testimony, was to show the true nature of defendant's past convictions. The statute allows it in this case." We fail to perceive the validity of the prosecutor's argument.

The prosecution's theory in this case was that during the course of a fight, the defendant struck the decedent over the head with a chair, thereby inflicting a fatal blow. The defendant does not deny fighting with the decedent, or deny striking him with his fists, but does not admit striking him with a chair and thereby killing him.

The trial judge was correct in his conclusion that the facts of this case support only three possible verdicts, (1) second-degree murder, (2) manslaughter, (3) not guilty. The prosecution becomes confused in its argument when it fails to recognize that the crime of manslaughter is in actuality composed of two separate and distinct

crimes, with differing elements, *i.e.,* voluntary manslaughter and involuntary manslaughter. As the Court stated in *People v Townes,* 391 Mich 578; 218 NW2d 136 (1974):

"From the standpoint of a defendant's culpability, voluntary manslaughter is the more serious of the categories. It requires that a defendant be found to have had an intent to kill or an intent to do serious bodily harm to the deceased. To this extent the offense parallels the crime of murder; but, as noted above, it is distinguished from murder by an absence of malice. To reduce a homicide to voluntary manslaughter the fact-finder must determine from an examination of all of the circumstances surrounding the killing that malice was negated by provocation and the homicide committed in the heat of passion."

Involuntary manslaughter, as this Court pointed out in *Townes, supra,* p 590 is defined as follows:

"Involuntary manslaughter is the killing of another without malice and *unintentionally,* but in doing some unlawful act not amounting to a felony nor naturally tending to cause death or great bodily harm, or in negligently doing some act lawful in itself, or by the negligent omission to perform a legal duty." (Emphasis added.)

As shown from the above definitions of the two forms of manslaughter, the prosecutor's argument that the prior actions of the accused somehow go to prove that the accused did not act by "mistake or accident" is valid, if at all, only if the crime charged is involuntary manslaughter, or that crime is a possible verdict in the case.

Let us examine the possible relevance of the fact that Gary Renno had a history of being drunk and disorderly, fighting, and supposedly, on one occasion, beating his wife.

In this case no claim of accident or mistake was made, and no instruction on these issues was given by the court to the jury.

These prior actions lose any relevancy they might have in cases such as the present. Other factual situations might, however, be different. Here it was not claimed, nor was any evidence introduced to the contrary, that the decedent met his death accidentally. There was no testimony that he possibly was killed by striking his head against some hard object. The only possible way the decedent died, from the evidence presented, was by being struck severely over the head with a large, flat object, a chair. Our law does not permit one to do such actions and then contend the injuries which normally result from such actions were a "mistake or accident". On the issue of voluntary manslaughter, such prior actions are inadmissible under these facts.

These prior actions are also irrelevant on the question of whether or not the defendant acted out of malice or rather as a result of adequate provocation and in the heat of passion. They therefore were inadmissible in the trial of this matter.

As shown above, the prior actions and convictions used by the prosecutor in this case to impeach the defendant were inadmissible both for that purpose and also under the provisions of MCLA 768.27; MSA 28.1050. Further, in *People v Falkner,* 389 Mich 682, 695; 209 NW2d 193 (1973) this Court stated:

"We hold that in the examination or cross-examination of any witness, no inquiry may be made regarding prior arrests or charges against such witness which did not result in conviction; neither may such witness be examined with reference to higher original charges which have not resulted in conviction, whether by plea or trial."

In *Falkner, supra,* one of the defense witnesses had pled guilty to receiving stolen property. The prosecutor brought out on cross-examination that he was originally charged with unarmed robbery. This Court held such questioning improper.

We feel that the prosecutor's inquiry into the factual basis behind defendant's guilty plea falls within the *Falkner* holding. He is doing no more than asking defendant what the original charges were which did not result in conviction. Such questioning was improper under our *Falkner, supra,* holding.

Due to the extremely prejudicial effect this evidence had on the defendant in this case, for the reasons stated above, we hold that its use constituted reversible error under these facts.

## *ISSUE 3*

On cross-examination of the defendant, the following colloquy occurred:

"*Q.* When were you in the service, Gary?
"*A.* 1967 to 1969, I guess.
"*Q.* Did you get into any trouble in the service?
"*A.* No, just for leaving without a pass once. I had an Article 15 for that. I was in Japan in the hospital and I left the post."

The Court of Appeals ruled on this issue as follows:

"Nonjudicial military punishment pursuant to Article 15 is informal. *Conn v United States,* 180 Ct Cl 120; 376 F2d 878, 880–881 (1967), *appeal after remand,* 187 Ct Cl 319; 407 F2d 879 (1969). Therefore, the probative value of such actions is outweighed by their potential prejudice, and reference to Article 15 actions for impeachment purposes is legally impermissible."

With this determination we agree.

## ISSUE 4

Defendant also contends that the totality of the conduct of the prosecutor in this case deprived defendant of his right to a fair trial. Besides pointing to the issues raised above, defendant also argues that part of the prosecutor's closing argument was highly improper and in error. He alludes to the following portion of the argument:

"Now, this is the testimony as to the death of Louis Moser, as to what caused the death, and as to what could not have caused the death. There was no other testimony from any source and you, therefore, must believe the testimony of the Doctor in this regard. He is the only one who testified in this regard and has to be believed in that case, he is the only expert."

The prosecutor's argument as set forth above is clearly incorrect. The jury is the sole judge of the credibility of the witnesses, and they may give whatever weight to any particular testimony they desire. They may also discount that testimony or disregard it if they feel the doctor is not credible. They do not "have to believe" his testimony solely because he is the only expert that testifies. We feel such argument is error and may amount to reversible error in an appropriate situation.

The prosecutor is cautioned against such argument in the future.

MCLA 770.1; MSA 28.1098 provides as follows:

"The court in which the trial of any indictment shall be had may grant a new trial to the defendant for any cause for which by law a new trial may be granted, or when it shall appear to the court that justice has not been done * * * ."

Due to the numerous errors committed in the trial of this case, some reversible error and some questionable reversible error, but all of them prejudicial to the defendant, this Court does not feel that justice has been done in this particular case. The Court of Appeals is reversed and the case remanded for a new trial.

T. G. KAVANAGH, SWAINSON, WILLIAMS, and LEVIN, JJ., concurred with T. M. KAVANAGH, C. J.

M. S. COLEMAN, J. *(affirm).* Defendant is appealing the Court of Appeals' decision upholding his conviction by a jury for manslaughter. See 46 Mich App 156; 207 NW2d 463 (1973). I believe defendant was properly convicted in a fair trial. I would affirm.

## FACTS

The killing of Louis Moser occurred in the early morning hours of January 15, 1971 during a barroom brawl. It appears that the participants were in a rather advanced stage of intoxication.

Defendant began drinking at 8 a.m. on January 14. His diet for the entire day consisted of beer. He spent the time in one bar, drinking and playing shuffleboard. In the early evening he was joined by the Lashbrook brothers, Wayne and Buck. The trio was asked to leave when Buck began acting in an offensive manner. In response, Buck threw a bottle at the barmaid and left.

The three men went to the Swissel Inn. They joined two couples who were there. Later Mr. Moser and a friend entered the inn and sat down at the table.

The reasons for the fight between Mr. Moser and

defendant are unclear as are the details. This is not surprising, considering the surroundings.

Apparently defendant was unemployed. Mr. Moser, who worked in construction, said he might help and told defendant to write down his name, address and phone number. Defendant could not remember his number. He says Mr. Moser called him "stupid".

The two men began discussing strength and ability to work. The discussion became an argument. Defendant invited Mr. Moser "to come on out to the back if he thinks I am so stupid." Mr. Moser started to go, reconsidered and returned to the table.

Defendant said the fight occurred at the table. He admits striking Mr. Moser with his fist but denies using any other implement.

The pathologist who performed the autopsy on Mr. Moser concluded that "the skull had been in plain words bashed down on top of his spine". The injury "was one where a heavy blow with a flat instrument with a large surface had been driven down upon the top of the head."

The barmaid testified that when the trouble began, she asked the Lashbrooks and defendant to leave. During the fight she saw defendant strike Mr. Moser on the head with a chair. Two other witnesses saw defendant bring a chair down upon Mr. Moser's head.

The defense called two witnesses. First was the barmaid at the tavern where defendant had spent the day. She said "Gary was always one of the nicest customers in the bar". Defendant "was a very nice person" and "was very quiet, stayed more or less to himself and played shuffleboard." She did not recall ever seeing him "what I would call inebriated."

"*Q.* You say he was a model customer, he had been in there before.

"What was he like when he was drinking?

"*A.* He was very quiet always, stayed by himself.

"*Q.* Did he ever get excited?

"*A.* No, never."

Defendant was the second witness. He talked about his military service. He recounted his drinking on the 14th. The following exchange occurred at the close of his direct examination:

"*Q.* Have you ever been in trouble before?

"*A.* Yes, drinking.

"*Q.* What do you mean by that?

"*A.* Drunk and disorderly, I guess.

"*Q.* When did that occur?

"*A.* About a month after I got out of the service.

"*Q.* Have you had any other charges?

"*A.* A couple of drunk charges, I guess about three of them.

"*Q.* Is that all?

"*A.* That's about it.

"*Q.* Anything else?

"*A.* No.

"*Q.* Total of how many charges against you?

"*A.* Three or four, I don't know for sure."

The prosecutor began his cross-examination in this manner:

"*Q.* Gary, wouldn't it be fairer to say ten times you have been arrested and convicted instead of three or four?

"*A.* For drunk, you mean?

"*Q.* Well, for everything and that includes drunk; is that right or isn't it right?

"*A.* Yes.

"*Q.* And that drunk on several occasions included fighting, didn't it?

"*A.* I guess so, yes.

"*Q.* And in fact, the last one on April 12, 1970, was you beating up on your wife, wasn't it?

"*A.* I wasn't beating up on my wife at all.

"*Q.* You weren't?

"*A.* No.

"*Q.* That isn't what it was?

"*A.* No.

"*Q.* Did the police come to your house?

"*A.* Yes, they did.

"*Q.* They observed what happened?

"*A.* No, they come after it was all over.

"*Q.* Did you at that time plead guilty to disorderly in front of Judge Kelly?

"*A.* Yes.

"*Q.* Paid a fine and costs, right?

"*A.* Yes."

Asked if he had any trouble in the service, defendant volunteered that he received nonjudicial punishment. He again denied fighting with his wife.

On redirect defendant's counsel sought to determine how many offenses occurred before defendant entered the service. Defendant's recollection was hazy. The prosecutor sought to lift the haze on recross. There were no objections.

The following day, defendant's counsel moved for a mistrial claiming that the cross-examination as to the alleged wife beating was improper. The court denied the motion.

The Court of Appeals discussed only one claim of error, believing the others to be without merit. While generally holding that evidence of informal nonjudicial military punishment is inadmissible, the court felt the isolated testimony in this case did not prejudice the jury.

## *STATUTES*

MCLA 600.2158; MSA 27A.2158 reads in part:

"No person shall be excluded from giving evidence on any matter, civil or criminal, by reason of crime * * * but such * * * conviction of crime, may be shown for the purpose of drawing in question the credibility of such witness, except as is hereinafter provided."

MCLA 600.2159; MSA 27A.2159 reads in part:

"No person shall be disqualified as a witness in any civil or criminal case or proceeding * * * by reason of his having been convicted of any crime; but such * * * conviction may be shown for the purpose of affecting his credibility."

## DISCUSSION

In my dissent to the Court's decision in *People v Jackson,* 391 Mich 323; 217 NW2d 22 (1974), I demonstrated that Michigan precedent supports

"the contention that the prosecutor has the right, during cross-examination, to offer defendant's prior convictions as evidence bearing on his credibility. The judge's discretion should prevent such a cross-examination from exceeding permissible limits."

I felt the Court had taken "the first step in the march to eliminate use of prior convictions to attack a defendant's credibility" despite the existence of contrary statutory and case law. The instant case is yet another step.

I retain and wish to repeat my reservations concerning the ultimate result of these decisions. The Court is determined to withhold from the jury evidence which assists them in determining the credibility of a defendant's testimony. As in the instant case, a defendant may testify in a manner which, if not intentionally deceitful, is designed to shade defects and highlight redeeming qualities.

Up to now, the prosecutor had available a method by which such artifice could be exposed and the jury presented with accurate facts.

The Court now has said that such prosecutorial rebuttal must be accomplished without benefit of relevant and effective information. I cannot subscribe to an opinion which so unfairly tilts the scales of justice.

I believe the cross-examination, while unnecessarily repetitive as to the alleged wife beating, does not mandate reversal. Defendant's witness characterized him as "very nice", as "very quiet", as never being "inebriated" or "excited". Defendant gave vague and misleading testimony regarding the duration and the frequency of his prior criminal misconduct. The prosecutor's examination sought to clarify the testimony.

Defendant was firm in his denials concerning the alleged altercation with his wife. Defendant's counsel did not believe the examination warranted an immediate objection. The trial judge properly refused the belated motion for mistrial. The jury was properly instructed regarding their use of information regarding prior convictions.

The Court also cites *People v Falkner,* 389 Mich 682; 209 NW2d 193 (1973) as requiring reversal in the instant case. The Court there held

"that in the examination or cross-examination of any witness, no inquiry may be made regarding prior arrests or charges against such witness which did not result in conviction; neither may such witness be examined with reference to higher original charges which have not resulted in conviction, whether by plea or trial."

In *Falkner* the prosecutor's cross-examination disclosed that certain witnesses had been convicted or

pled guilty for offenses of a lesser degree than those originally charged. Such cross-examination was reversible error.

A cross-examination of similar degree is not present in the instant case. There was no discussion of a plea to a lesser offense.

Further, on direct examination, defendant put his character and his reputation for peacefulness into issue. The prosecutor had a right to cross-examine and rebut as to those issues.

Defendant had a fair and vigorously contested trial. The jury's decision was that defendant killed Mr. Moser. I would not disturb that finding.

J. W. FITZGERALD, J., did not sit in this case.