PEOPLE v McMILLAN

OPINION OF THE COURT

1. CRIMINAL LAW—CASE PRECEDENT—EFFECTIVE DATE—DATE OF PUB-
   LICATION—ADVANCE SHEETS—SLIP OPINIONS—DEFENSES—ALIBI
   DEFENSE.
   The date of publication of an opinion in the Advance Sheets of
   Michigan Reports, not the date of the slip opinion, is the
   effective date of a decision holding that it is reversible error for
   a trial court to denigrate an alibi defense as easily proven and
   hard to disprove or to suggest that it is the burden of the
   defendant to establish the defense, where the Michigan Su-
   preme Court's opinion read in part "for cases tried after the
   publication of this opinion".

2. CRIMINAL LAW—CASE PRECEDENT—DEFENSES—ALIBI DEFENSE—
   JURY INSTRUCTIONS—BURDEN OF PROOF—EFFECTIVE DATE.
   Instructions to the jury regarding an alibi defense, which twice
   informed the jury that proof of an alibi was not necessary for
   acquittal and emphasized that the burden of proof beyond a
   reasonable doubt remained with the prosecution, which when
   read in their entirety satisfied the existing standards, were
   adequate instructions where they were given prior to the
   effective date of a case holding otherwise.

3. WITNESSES—CRIMINAL LAW—CROSS-EXAMINATION—IMPEACHMENT—
   CREDIBILITY—TOPLESS BARS.
   A prosecutor's cross-examination which forced a defendant to
   admit that she had worked in two different bars after earlier
   stating that she had not been employed since her divorce was
   an effective and proper impeachment of the defendant's credi-
   bility, and, where the remainder of the prosecutor's cross-exam-

REFERENCES FOR POINTS IN HEADNOTES
[1, 2] 21 Am Jur 2d, Criminal Law §§ 136, 137.
[3–5, 7] 81 Am Jur 2d, Witnesses §§ 524, 525, 582, 593.
[6] 81 Am Jur 2d, Witnesses § 597.
[8] 81 Am Jur 2d, Witnesses § 656 et seq.
  Credibility of witness giving uncontradicted testimony as matter for
  court or jury. 62 ALR2d 1191.

ination was permissible, reversal is not required because there was a reference to places where the defendant admitted having been employed at topless bars.

4. Witnesses—Criminal Law—Cross-Examination—Impeachment— Credibility—Prior Convictions—Misdemeanors—Felonies— Record.

A defendant's claim on appeal that her credibility was improperly impeached by a prosecutor's reference to her prior misdemeanor convictions is not supported by the record where, on cross-examination, she testified that she was convicted of "shoplifting" and of "solicitation" and these terms describe equally well a number of separate offenses, some of which are misdemeanors and some of which are felonies, and the Court of Appeals, when reading the record, is uncertain as to whether the convictions were for felonies or for misdemeanors.

5. Witnesses—Criminal Law—Cross-Examination—Impeachment— Misdemeanors.

The rule which prohibits the bringing forth on cross-examination of misdemeanor convictions for impeachment purposes should be limited to those misdemeanors which carry a maximum of 90 days in the county jail; those misdemeanors which are punishable by imprisonment in a state prison should not come within this prohibition.

6. Witnesses—Criminal Law—Testimony—Rebuttal Testimony— Cumulative Testimony—Abuse of Discretion—Defenses— Alibi Defense.

The admission of testimony which was presented as being rebuttal testimony but which was not properly classified as such and which may be merely cumulative was not an abuse of the trial judge's discretion; where the prosecutor, at trial, presented three witnesses who identified the defendant as the woman who attempted to cash the check in question, and the defendant then presented testimony indicating that the defendant was elsewhere at the time of the crime, and the prosecutor recalled the three eye-witnesses who repeated their identification testimony, the testimony of the eye-witnesses was merely cumulative evidence.

Dissent by M. J. Kelly, J.

7. Witnesses—Criminal Law—Cross-Examination—Impeachment— Prior Convictions—Misdemeanors.

*The rule prohibiting the use on cross-examination of prior misde-*

*meanor convictions for impeachment purposes is now limited to those misdemeanors which carry a maximum penalty of 90 days in the county jail, and those misdemeanors which are punishable by imprisonment in a state prison are no longer subject to this prohibition; however, where a prosecutor's cross-examination of a defendant, in an effort to impeach her credibility, brought out two misdemeanor convictions and a violation of parole, it constituted reversible error, where larceny of less than $100 and accosting and soliciting, each of which carries a maximum penalty of 90 days in the county jail, were the offenses which the defendant was talking about beyond peradventure.*

8. WITNESSES—CRIMINAL LAW—CROSS-EXAMINATION—TRIAL-COURT DISCRETION—CREDIBILITY—JURY PREJUDICE—ABUSE OF DISCRETION—FAIR TRIAL.

*The scope of cross-examination lies within the sound discretion of the trial court, however, that discretion should be exercised "in such a way that a defendant is not cross-examined under the guise of testing credibility, merely to prejudice the jury"; where the trial court fails, over the repeated objections of defense counsel, to restrain the prosecutor, on cross-examination, from going into immaterial aspects of a defendant's life and background, the defendant has been deprived of the right to a fair trial.*

Appeal from St. Clair, Halford I. Streeter, J. Submitted November 7, 1975, at Detroit. (Docket No. 22695.) Decided March 24, 1976. Leave to appeal applied for.

Donna Jean McMillan was convicted of uttering and publishing a forged instrument. Defendant appeals. Affirmed.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *Peter E. Deegan,* Prosecuting Attorney, and *Peter R. George,* Chief Appellate Attorney, for the people.

*Sharon M. Sloan,* Assistant State Appellate Defender, for defendant.

Before: D. E. Holbrook, P. J., and J. H. Gillis and M. J. Kelly, JJ.

J. H. Gillis, J. A jury convicted defendant of uttering and publishing, contrary to MCLA 750.249; MSA 28.446. She was sentenced to a 2-1/2 to 14 year prison term, and appeals as of right.

On June 15, 1973, a woman attempted to cash a stolen check in a Port Huron grocery. The check was drawn on the account of one Shirley Ashford and made payable to Donna McMillan. When the store manager called the bank to verify the check, the woman fled. Three witnesses identified defendant as the woman who attempted to cash the check.

On appeal, defendant raises several issues for our consideration. We will discuss them *seriatim.*

## I.

### The Alibi Instruction

At trial, defendant presented alibi testimony, and now raises objections to the instruction given the jury on alibi. Defendant urges reversal because the instruction contains language specifically disapproved in *People v McCoy,* 392 Mich 231; 220 NW2d 456 (1974), *viz.:*

"For cases tried after the publication of this opinion, it will be deemed reversible error (1) to denigrate the alibi defense 'as easily proven and hard to disprove' or to suggest that it is the burden of the defendant to 'establish' the defense." 392 Mich at 240; 220 NW2d at 460.

Here the jury was told that an alibi defense "is one easily made or manufactured and likewise hard to disprove". The instructions also spoke of "sustaining" the defense.

The *McCoy* slip opinion[1] is dated August 2, 1974. The Advance Sheets of Michigan Reports containing the opinion is dated August 30, 1974. We must decide whether "publication" of the *McCoy* opinion is the date of the slip sheet decision or the date the decision appeared in the Advance Sheets of Michigan Reports. Though at least four opinions of this Court have stated that *McCoy* governs trials after August 2, 1974, *People v Crutchfield,* 62 Mich App 149; 233 NW2d 507 (1975), *People v Davis,* 61 Mich App 220; 232 NW2d 683 (1975), *People v Phelps,* 57 Mich App 300; 225 NW2d 738 (1975), *People v Thomas,* 55 Mich App 368; 222 NW2d 320 (1974), there is no indication that in any of these decisions the court was required to focus upon the exact meaning of "publication" of *McCoy.* The choice of August 30th rather than August 2nd would not have led to a different result in any of these prior decisions, and we feel compelled to distinguish them on that basis.

In determining the extent of prospective effect we review other Supreme Court opinions dealing with the prospective timing of a rule the Court has pronounced. In *People v Brown,* 393 Mich 174, 181; 224 NW2d 38 (1974), the Court stated that the announced rule would govern "cases resulting from charges made on and after the date of this opinion". In *People v Davis,* 392 Mich 221, 227; 220 NW2d 452 (1974), the Court limited its rule to

---

[1] As we understand the procedure, after the opinion was signed by the justices of the Supreme Court, the clerk's office stamped the original "filed August 2, 1974". This date appeared on all reproductions of the slip opinion although dissemination occurred later. After 100 copies were printed by the Court Crier, but before remittitur (judgment order, which in this case was August 26, 1974), the Clerk's office mailed slip opinions to the parties, the trial judge, the Court of Appeals and some 60 regular subscribers. Final process issued in accordance with GCR 866 on August 26, 1974, and general circulation was effected in the Advance Sheets of Michigan Reports under date of August 30, 1974.

"future cases and in pending cases where defendants timely contested". The decision in *People v Tanner,* 387 Mich 683, 690; 199 NW2d 202 (1972), was limited by the Court "to those cases in which sentence is to be or has been imposed *after date of filing* of this opinion and to those cases which *on date of filing* of this opinion are pending". (Emphasis supplied.) A new rule in workmen's compensation which the Court announced in *Whetro v Awkerman,* 383 Mich 235, 244; 174 NW2d 783 (1970), only applied to claims for compensation "arising after March 12, 1970, the *date of the filing* of this opinion". (Emphasis supplied.)

As in *McCoy, People v Robinson,* 390 Mich 629, 634; 213 NW2d 106 (1973), speaks of publishing rather than filing when setting the operative date. Several Court of Appeals' opinions have interpreted "[i]n appeals filed after this opinion is published" to mean that the rule in *Robinson* governs only after the date the opinion appeared in the advance sheets.[2] *People v Coppernol,* 59 Mich App 745; 229 NW2d 913 (1975), *People v Robert Hall,* 56 Mich App 10; 223 NW2d 340 (1974), *People v Koehler,* 54 Mich App 624, 640; 221 NW2d 398 (1974)' (dissenting opinion by O'HARA, J.).[3] We believe this to be the better rule.

[2] The date of publication of an opinion in the Advance Sheets of Michigan Reports should be included in the later bound volume. Most users dispose of the Advance Sheets pamphlets after the bound volume is received. If our ruling is not changed by the Supreme Court, readers of the bound volumes should hereafter be supplied the Advance Sheet publication date because of its significance.

[3] Note that Judge O'HARA's dissent describes *Robinson's* date of publication as January 28, 1974. This was the date of publication in the Advance Sheets of Michigan Reports. That date is nowhere carried forward in the Michigan Reports bound volume 390. At page 630, the decision date is described as December 18, 1973. This would be the date of the slip opinion, the date the clerk's office stamps the original, "filed December 18, 1973". Lawyers and judges relying solely on publication in the Northwestern Reporter have yet another problem as the date of the Northwestern Reporter, 2d series publications

Had the Court in *McCoy* intended its prohibition to become immediately effective, it could have used a word other than "publication" in expressing that intention. The Court could have spoken of the date of the opinion, the date of its filing or the date of its release. By using one of these phrases, rather than speaking of publication, the Court would have clearly indicated that it intended its pronouncement to be immediately effective.

Reading "publication" to mean publication in the Advance Sheets of Michigan Reports allows the bench and bar opportunity to become aware that certain practices, formerly allowed, are now considered error. We should not expect reliance on unavailable judicial pronouncements. We conclude that "publication" used in *McCoy* means appearance in the Advance Sheets of Michigan Reports and that the prohibition in *McCoy* against certain language in alibi instructions did not become effective at the time of trial of defendant McMillan. We are forced to repudiate prior statements of this Court holding that *McCoy* became effective on August 2, 1974, the date of the slip opinion. However, moving the date forward to August 30, 1974, casts no doubt upon the validity of any of the opinions as it would not change the result in any of the prior decisions.

The *McCoy* rule not having been in effect, we find that the alibi instruction given in this case twice informs the jury that proof of alibi is not necessary for acquittal, and emphasizes that the burden of proof beyond a reasonable doubt remains with the prosecution. We find these instruc-

are different from the Advance Sheets of Michigan Reports. Students of the release and publication of opinions rendered by the Michigan Court of Appeals will recognize another and no less complex set of problems.

tions adequate, as when read in their entirety they satisfied existing standards.

## II.

### The Cross-Examination

Defendant also alleges that the prosecutor improperly cross-examined her, and that reversal is mandated. On direct examination, McMillan testified that she was 29 years old, divorced, the mother of six children and unemployed. On cross-examination, she stated that she had not been employed since her divorce. The prosecutor then effectively and properly impeached her credibility by forcing her to admit that she had, in fact, worked in two different bars. We agree with Judge Kelly's determination that reference to the fact that the bars were "topless" was irrelevant and improper. Because, however, we find the remainder of his cross-examination permissible, the reference to topless bars does not require reversal.

## III.

### Impeachment of Defendant's Credibility

Defendant next argues that her credibility was improperly impeached in that the prosecutor referred to her prior misdemeanor convictions. Our reading of the record leaves us uncertain as to whether the convictions were for felonies or misdemeanors.

On direct examination, defendant testified that she was in jail at a certain time. On cross-examination, the prosecutor inquired as to the nature of the crimes that defendant had been jailed for:

"*Q.* Have you been convicted of anything else?

"*A.* Yes.

"*Q.* What?

"*A.* I was convicted of shoplifting.

"*Q.* When was that?

"*A.* During the time I am on probation.

"*Q.* Would that have been about in September, 1971?

"*A.* I don't know. It could have been.

"*Q.* Any other crimes that you have been convicted of?

"*A.* Soliciting.

"*Q.* Soliciting for what?

"*A.* What do you mean for what?

"*Q.* Soliciting for what?

"*A.* I don't know. I got soliciting. I don't know for what.

"*Q.* For purposes of prostitution?

"*A.* They said soliciting. That's all I know."

Defendant testified that she was convicted for "shoplifting". This term is frequently used to cover three separate offenses, two of which are felonies, the other a misdemeanor. If goods were "lifted" or stolen from a building, then regardless of the goods' value, defendant may be convicted of larceny from a building, a felony. MCLA 750.360; MSA 28.592. If defendant "lifts" or steals goods valued at over $100, this fact supports a conviction for larceny over $100, also a felony. MCLA 750.356; MSA 28.588. If defendant "lifts" or steals goods valued at under $100, this fact supports a conviction for larceny under $100, a misdemeanor punishable by 90 days in the county jail. MCLA 750.356; MSA 28.588, MCLA 750.504; MSA 28.772. All three of these offenses are referred to as "shoplifting".

Likewise, defendant testified that she had been convicted of "soliciting". There is no such offense in Michigan. There are many offenses involving

solicitation; some are felonies, some are misdemeanors. For example, accosting and soliciting is a misdemeanor, MCLA 750.488; MSA 28.703; soliciting an athlete is a felony, MCLA 750.124; MSA 28.319; soliciting patients for a dentist is a misdemeanor, MCLA 338.216; MSA 14.629(16); and soliciting anyone to polygamous life is a felony, MCLA 750.441; MSA 28.696. This list is not exhaustive; it is used for illustrative purposes only.

It is our belief that defendant's claim that she was impeached by use of prior misdemeanor convictions is not supported by the record. Even if this assumption was true, *People v Renno,* 392 Mich 45; 219 NW2d 422 (1974), does not mandate reversal, in that its holding does not constitute a per se reversal rule. Under the circumstances of this case, and assuming *arguendo* that the convictions were for misdemeanors, we hold the error harmless. *People v Roberson,* 55 Mich App 413; 222 NW2d 761 (1974).

In line with the above discussion, it is our belief that *Renno, supra,* needs some clarification. It prohibits, for impeachment purposes, the bringing forth of misdemeanor convictions. *Renno* makes no distinction between high misdemeanor convictions carrying penalties of up to two years in prison and regular misdemeanor convictions carrying penalties of up to 90 days in jail.

In the *Renno, supra,* opinion, the majority noted that the Michigan Legislature had passed certain statutes enabling people, historically disqualified from testifying by common law, to testify. Common law had prohibited those convicted of "infamous crimes" from ever testifying in a court of law. As *Renno* indicated, the Legislature changed this situation so that those convicted of "infamous crimes" could now testify, but they were subject to

having their credibility impeached by any conviction of an infamous crime. *Renno* held that from hence forward, only convictions for infamous crimes could be used to impeach a witness. *Renno* further equated infamous crimes with felonies.

We do not think that, in Michigan, the term "infamous crime" can necessarily be equated with the term "felony". In *Attorney General v Montgomery*, 275 Mich 504, 513; 267 NW 550 (1936), our Supreme Court defined an infamous crime as follows:

> "Whether a crime is infamous or not is not determined by the nature of the offense (2 Bouvier's Law Dictionary [Rawle's 3d Rev] p 1553, 1554), but by the consequences to the individuals by the punishment prescribed for such offense. Butler v Wentworth, 84 Me 25 (24 Atl 456, 17 L.R.A. 764). Crimes subject to infamous punishments are infamous crimes, *and the term 'infamous crime' means any crime punishable by imprisonment in the state prison.*" (Citations omitted, emphasis supplied.)

It would then appear that under *Montgomery, supra,* impeachment should be permissible by use of prior convictions based on a crime punishable by imprisonment in the state prison, regardless of whether it is dubbed "felony" or "misdemeanor".

We do not point out this apparent inconsistency to nitpick at the Supreme Court. Real problems are presented in this area. For example, the crime of unlawfully taking and using an automobile is labeled a misdemeanor, but, nonetheless, carries the possible sentence of two years imprisonment in a state penitentiary. MCLA 750.414; MSA 28.646. On the other hand, the crime of issuing a check without an account or credit is labeled a felony although it also carries a possible maximum sentence of two years in the state prison. MCLA

750.131a; MSA 28.326(1). Under *Renno,* the prosecutor would be allowed to impeach credibility by using a conviction under MCLA 750.131a; MSA 28.326(1); he would not be able to do so by using one under MCLA 750.414; MSA 28.646. Yet the two statutes carry exactly the same penalties, and we believe, under *Montgomery,* there is no distinction between them in regards to impeaching credibility.

The problem is compounded by the fact that the Legislature has had a difficult time in deciding what constitutes a felony and what constitutes a misdemeanor. Under MCLA 750.7; MSA 28.197, a "felony" is defined to mean "an offense for which the offender, on conviction may be punished by death, or by imprisonment in state prison". MCLA 761.1(g); MSA 28.843(g), defines a felony as "an offense for which the offender, upon conviction, may be punished by death or imprisonment * * * for more than 1 year or an offense expressly designated by law to be a felony". A misdemeanor is described as follows:

"When any act or omission, not a felony, is punishable according to law, by a fine, penalty or forfeiture, and imprisonment, or by such fine, penalty or forfeiture, or imprisonment, in the discretion of the court, such act or omission shall be deemed a misdemeanor." MCLA 750.8; MSA 28.198.

It is little wonder that trial judges sometimes have difficulty labeling an offense as misdemeanor or felony.

The Legislature has broken misdemeanors into two categories, some punishable by imprisonment in the *state* prison (see *e.g.,* MCLA 750.414; MSA 28.646), and some punishable by a maximum of 90 days in the *county* jail. MCLA 750.504; MSA

28.772. We think that it would both be more logical and more in spirit with the holding of *Montgomery, supra,* if the rule of *Renno* was limited to those crimes carrying a maximum of 90 days in the county jail.

## IV.

### Rebuttal Testimony

Defendant next alleges reversible error by claiming that the trial judge improperly allowed certain testimony to be presented under the guise of "rebuttal" evidence. At trial, in his case in chief, the prosecutor presented three witnesses who identified defendant McMillan as the woman who attempted to cash the check. Defendant then presented testimony, including her own, that indicated she was elsewhere at the time of the crime. The prosecutor then recalled the three eyewitnesses who then repeated their identification testimony. We find no abuse of discretion on the trial judge's part. The testimony tended to contradict matters raised by defense witnesses. Even if the testimony was not properly classified as "rebuttal", it was merely cumulative. See, *People v Ames,* 60 Mich App 168; 230 NW2d 360 (1975), *People v Tocco,* 60 Mich App 130; 230 NW2d 341 (1975).

Other allegations of error are meritless.
Affirmed.

D. E. HOLBROOK, P. J., concurred.

M. J. KELLY, J. *(dissenting).* I agree with the majority opinion on the effective date of *People v McCoy,* 392 Mich 231; 220 NW2d 456 (1974), being the date of publication in the Advance Sheets of

Michigan Reports. I think however this conviction should be reversed for improper cross-examination and for impeachment on prior misdemeanor convictions. The point made in the majority opinion as to two-year misdemeanors is well taken, but it is inapplicable to the facts of this case. I think the cross-examination which was allowed, over objection, bringing out the two misdemeanor convictions and a violation of probation, was a clear violation of the rule announced in *People v Renno*, 392 Mich 45; 219 NW2d 422 (1974). I do not believe that her revelation about being incarcerated during the first check cashing episode opened the door for the prosecution to bypass the *Renno* rule. I think it is pure speculation on the part of the majority to talk about larceny from a building or larceny over $100, and I think it is even farther afield to talk about soliciting an athlete or patients for a dentist. Accosting and soliciting was the offense she was talking about beyond peradventure.

After the people's case rested, the factual testimony supporting the alibi was presented by defendant and her witnesses. The prosecution's case was weakened somewhat when it was shown that on May 19, 1973, two checks from this same account made payable to this same defendant were feloniously cashed during a time when it would have been impossible for the defendant to have been criminally responsible since she was incarcerated. This was probably the single most damaging bit of evidence to the prosecution's case, and the defense asserts that the prosecution thereafter became an assault on her character rather than a trial of the facts; that she was thereby denied a fair trial. The prosecution began its cross-examination with the following questions:

"*Q. [By Mr. Colley:]* How old are you, Mrs. McMillan?

"*A.* Twenty-nine.

"*Q.* You testified you had six children?

"*A.* Yes.

"*Q.* You are divorced?

"*A.* Yes.

"*Q.* How long have you been divorced?

"*A.* About four years.

"*Q.* You testified you are not employed?

"*A.* No.

"*Q.* No, you are not employed or yes, you are employed?

"*A.* No, I am not employed.

"*Q.* Okay. Have you been employed since your divorce? Let's see, are you receiving any support from your ex-husband?

"*A.* No.

"*Q.* Then you are receiving ADC?

"*A.* Yes.

"*Q.* How long have you been receiving this?

"*A.* About seven years or so.

"*Q.* And, during this time, you have been divorced from your husband have you been employed?

"*A.* No.

"*Q.* You haven't been employed any time since your divorce?

"*A.* No.

"*Mr. Bankson:* I will object to the question. It is irrelevant and immaterial.

"*The Court:* She may answer.

"*Mr. Cooley [Continuing]:*

"*Q.* You have never worked or been employed?

"*A.* No.

"*Q.* Isn't it true you worked out at the Hideaway Bar?

"*Mr. Bankson:* Objection, your Honor. Irrelevant and immaterial and a little bit prejudicial.

"*Mr. Cooley:* She testified she hasn't worked in the last four years.

"*The Court:* She may answer.

*"Mr. Cooley [Continuing]:*
*"Q.* You worked at the Hideaway Bar?
*"A.* Yes.
*"Q.* What capacity was that?
*"A.* Waitress.
*"Q.* Have you worked other places?
*"A.* No, I haven't.
*"Q.* Have you worked at Capac?
*"A.* Part-time, about two years ago.
*"Q.* What capacity there?
*"A.* Waitress, bar maid.
*"Q.* What bar was that?
*"A.* Stonewall Lounge.
*"Q.* Are both of these bars topless bars?
*"Mr. Bankson:* I object, your Honor, and at this time ask for a mistrial. I see no relevancy or significance to this trial of that question, and I strong [sic] object.
*"Mr. Cooley:* Your Honor, first I asked whether she had been employed and she denied it. They have a right to know the credibility of this witness.
*"Mr. Bankson:* I don't see what that has to do with credibility.
*"Mr. Cooley:* As to what a person does for a living and so on, they have a right to know.
*"The Court:* You may proceed.
*"By Mr. Cooley [Continuing]:*
*"Q.* Have you ever reported any of these earnings to the ADC?
*"A.* Yes.
*"Mr. Bankson:* I will object, your Honor. This is irrelevant.
*"The Court:* You may proceed.
*"By Mr. Cooley [Continuing]:*
*"Q.* You have?
*"A.* Yes."

While the scope of cross-examination lies within the sound discretion of the trial court, that discretion should be exercised "in such a way that a

defendant is not cross-examined, under the guise of testing credibility, merely to prejudice the jury". *People v Eddington,* 387 Mich 551, 567; 198 NW2d 297 (1972). The similarity between the line of questioning the prosecution pursued here and the questioning found offensive in *People v Johnson,* 393 Mich 488; 227 NW2d 523 (1975), is remarkable. Furthermore, it cannot be said here, as urged by the dissent in *Johnson,* that whether poor or not, the defendant was clearly guilty. The jury agonized considerably over this case before reaching a verdict. All the testimony of the three main prosecution witnesses was reread to the jury; all of defendant's testimony was reread. Several other requests were made by the jury before a verdict was returned. I would hold that the failure of the trial court, over repeated objection of defense counsel, to restrain the prosecutor from going into immaterial aspects of defendant's life and background, deprived defendant of the right to a fair trial.

I would reverse.