PEOPLE *v.* MARANIAN.

1. CRIMINAL LAW—DISCOVERY—DISCRETION OF COURT.

Discovery will be ordered in a criminal case, when, in the discretion of the trial judge, the thing to be inspected is admissible in evidence and a failure of justice may result from its suppression.

2. SAME — INSPECTION OF STATEMENTS — RECORDINGS — BURDEN OF PROOF.

One seeking an order to compel the prosecution to allow discovery by inspection of statements of people's witnesses and recordings of telephone conversations has the burden of showing the trial court facts indicating that such inspection is necessary to preparation of his defense and in the interests of a fair trial.

3. SAME—DISCOVERY.

Denial of defendant's broad discovery motion, made before trial and again at its commencement, in prosecution for extortion *held*, proper, where it sought to obtain information obtainable at cross-examination of complaining witness, the showing of necessity for such discovery being insufficient (CL 1948, § 750-.213).

4. EXTORTION—COLLECTION OF DEBT.

The courts provide a legal and proper forum in which to determine whether or not a debt was fraudulently incurred, and

---

REFERENCES FOR POINTS IN HEADNOTES

[1–3] 17 Am Jur, Discovery and Inspection § 32.
  Right of accused to inspection or disclosure of evidence in possession of prosecution.  52 ALR 207.
[4] 22 Am Jur, Extortion and Blackmail § 21.
[5] 20 Am Jur, Evidence § 399.
  Admissibility of telephone conversations in evidence.  71 ALR 5, 105 ALR 326.
[6] 20 Am Jur, Evidence § 400.
[7] 20 Am Jur, Evidence § 400.
  Admissibility of sound recordings in evidence.  58 ALR2d 1024.

if so, afford a possible method of collection, hence, the collection of a valid, enforceable debt does not permit malicious threats of injury to the debtor's person, his loved ones, or property if payment is not made, as they would, if proved, constitute extortion as defined by statute (CL 1948, § 750.213).

5. EVIDENCE—TELEPHONE COMMUNICATION—STATE COURTS—FEDERAL COMMUNICATIONS ACT.

Evidence of intrastate telephone communication, recorded by city police officers without the sender's consent, *held*, admissible in State court in prosecution for extortion, the prohibition against use of such intercepted communication, contained in the Federal communications act, being inapplicable to exclude such evidence, taken by State officers, from admission in State courts (47 USC [1958 ed], § 605).

6. SAME—WIRETAPPING—EXTORTION.

The recording in exact words of a voice or voices of those engaged in communicating the threats of injury to the victim by placing a recording device on the receiver's own telephone does not constitute wiretapping any more than would the listening in on an extension phone.

7. SAME—TELEPHONE COMMUNICATION—CONSENT OF RECEIVER—STATUTES—EXTORTION.

Evidence of intrastate telephone communication, recorded by city police officers without the consent of the sender but with the consent of complaining witness in prosecution for extortion, *held*, admissible in evidence, where trial court first had them played out of the presence of the jury to rule on objections by defendant before jury heard the recordings, as they were not taken in violation of the State statute making it a high misdemeanor to wiretap telephone instruments (CL 1948, § 750.540).

8. EXTORTION—EVIDENCE—INTENT.

Evidence presented in prosecution for extortion *held*, sufficient to permit jury to find that defendant had the intent to extort money from another and sufficient to sustain the verdict of guilty (CL 1948, § 750.213).

Appeal from Recorder's Court of Detroit; Groat (Gerald W.), J. Submitted October 15, 1959. (Docket No. 84, Calendar No. 48,112.) Decided April 11, 1960.

Moses Maranian was convicted of extortion. Affirmed.

*Paul L. Adams,* Attorney General, *Samuel J. Torina,* Solicitor General, *Samuel H. Olsen,* Prosecuting Attorney, *Samuel Brezner* and *Angelo A. Pentolino,* Assistant Prosecuting Attorneys, for the people.

*Colombo, Colombo & Colombo,* for defendant.

KAVANAGH, J. Defendant was convicted on December 9, 1957, by a jury in the recorder's court of the city of Detroit of the crime of extortion contrary to the provisions and form of the statute, CL 1948, § 750.213 (Stat Ann § 28.410), and sentenced to a term of imprisonment of not less than 3-1/2 years nor more than 20 years. Motion for new trial was denied. Leave to appeal was granted by this Court.

The information filed in the cause read in part as follows:

"and gives the said court to understand and be informed that Moses Maranian late of the said city of Detroit, in said county, heretofore, to-wit, on the 4th day of September, a. d. 1956, and on divers other days and dates up to said and including the 22d day of September, a. d. 1956, at the said city of Detroit, in the county aforesaid did then and there orally maliciously threaten injury to the property and person of others, to-wit, Leo Janoff and his family, said threat being substantially in words as follows: 'Unless payment on all old debts are paid before next week it will be too late. Next time it will be more drastic and we will put the bomb where it will hurt someone and we will bomb your property,' with intent thereby to extort money or any pecuniary advantage whatever, and to compel the said Leo Janoff to pay the sum of $1,000, the same being against the will of him, the said Leo Janoff; contrary to the form

of the statute in such case made and provided, and against the peace and dignity of the people of the State of Michigan."

The proofs in the case were substantially based upon the testimony of Leo Janoff and one Robert W. Blythe, an alleged accomplice, together with 2 tape recordings of telephone conversations obtained by the police by attaching a recorder to Janoff's telephone.

Leo Janoff testified that he was a jobber in the tobacco business from 1950 until sometime in 1954; that in the early part of 1954 he was in financial difficulty and in March of that year purchased merchandise from defendant Lester Greenspan in the approximate sum of $5,000, for which he gave checks which were returned for insufficient funds. Janoff also testified he informed Mr. Greenspan at the time he gave him the checks that he did not have the money in the bank and that it would be necessary for Greenspan to hold them for a number of days until he was able to get the money deposited. Shortly thereafter, an involuntary petition in bankruptcy was filed against Janoff. Eventually he was adjudicated a bankrupt and discharged. Janoff testified that his indebtedness was of the approximate sum of $50,000.

On September 4, 1956, Janoff received a telephone call from an unidentified person, who in effect said "Why don't you take care of Lester Greenspan." Shortly thereafter on the same day Lester Greenspan, whom Janoff had known for about 15 years, called and demanded his money. Janoff told Greenspan he could not talk about it on the telephone and would drop in to see him in about a week, to which Greenspan replied that would be too late.

On September 8, 1956, about 9:00 p.m., Janoff heard an explosion in the alley in the rear of his

home. On examination, he found a lot of smoke and a part of his garage had been damaged. A few minutes later the police arrived, and they determined that a bomb had been set off near the garage. Janoff then informed the police about the telephone calls.

On September 10, 1956, Lieutenant Stearla of the Detroit police department, with Janoff's consent, placed a tape recorder on Janoff's telephone. On September 12th Janoff received a telephone call from a third person, later identified as defendant Maranian. This party stated he was responsible for the bombing. He said he was collecting Janoff's tobacco accounts and unless payment was made more drastic action would be taken. He further stated he would contact Janoff later. On September 17, 1956, the same person called, and the conversation related by Janoff was in substance as follows: Janoff told the caller (Maranian) he had raised around $400, but was informed he would have to do better since the money had to be divided up a number of ways. Janoff asked to whom he should pay the money, and the party indicated he would give Janoff a receipt for the money or post-dated checks. The caller said the checks were some checks that Janoff had given to one of his creditors that came back unpaid. He said, "Things will get worse if you don't raise more money." He further stated, "Perhaps we go to extremes, but we mean business." He asked Janoff if he had the $400 with him. Janoff was following police instructions at the time and he informed the other party, "No, he would have to wait a day." Janoff was then informed he would have to anticipate more trouble. The caller said, "This is the only thing the third man understands," and "You better start thinking where you can get some money." The caller also said, "Go out and steal it somewhere." He further stated that Janoff "had a lot of things to

think of, his wife, his children," and closed the conversation by saying he would call on Wednesday.

On September 21, 1956, the person who first called Janoff called again. Janoff informed him that he had $1,000. Arrangements were made to meet the caller at Livernois and Fenkell avenues in the city of Detroit to give him the $1,000. Janoff drove his car to the designated intersection accompanied by a detective concealed in the back seat. Robert Blythe approached the car when it stopped at the intersection and asked for the money. The police officer arose from the back seat, chased Blythe, apprehended him, and placed him under arrest.

Janoff testified that shortly after he arrived home he received a telephone call, the caller saying "Hello, you got the wrong man, sucker."

Robert W. Blythe testified he had known Moses Maranian for 20 years. He stated he was unemployed at the end of August, 1956, at which time he engaged in a conversation with defendant Maranian, who told him Leo Janoff was indebted to various tobacco concerns. Blythe said Maranian suggested that Blythe attempt to collect the account, the latter to receive 25% of the amount collected. Maranian had the unpaid checks and Blythe, being unemployed, decided to try and collect them. After leaving Maranian, Blythe called Janoff and requested payment. Janoff told him he had settled one way or another and that he did not intend to pay. Janoff stated his was only a moral obligation. Blythe then returned and told Maranian of his call. Maranian informed Blythe he would call Janoff. Blythe testified that subsequently, in a discussion with Maranian about the bombing, Maranian said "they had shook him up" and "that Janoff should be willing to pay some moneys then." Blythe further testified Maranian had said that they had thrown a "pineapple."

Blythe also testified that on September 12, 1956, he called Janoff and asked Janoff what he intended to do. Janoff said he would try to arrange some type of payment. Janoff wanted to know to whom he was talking. Blythe told him it didn't matter, that he was not connected with the bombing, but that he knew about it. Blythe further testified that he called Janoff again on September 17th and that Janoff informed him he had $400. Blythe indicated this was not enough and that Janoff would have to get more. He further told Janoff that he did not believe that Janoff would want them to get rougher.

Blythe further testified that on September 18th he told Maranian of his conversation with Janoff and Maranian replied he would talk to Janoff again. Blythe didn't know whether Maranian called Janoff subsequent to that time.

On September 21st Blythe called Janoff, and arrangements were made with reference to the payment of the $1,000. When Blythe met Janoff at Livernois and Fenkell he had 3 checks executed by Janoff which had been given to him by Maranian. On arrival at Livernois and Fenkell he was arrested.

Blythe stated he was never present when Maranian made any telephone calls to Janoff. He did testify that Maranian was present when he called Janoff to arrange the collection of the $1,000. Janoff's testimony with reference to the telephone conversations was substantially borne out by the recordings which were introduced in evidence.

Following examination and prior to trial the defendant filed a motion to require the people to produce the statements of Robert W. Blythe, Lester Greenspan, and Leo Janoff, memoranda and reports made by police officers in connection with the case, and also all recordings of the telephone conversations. This motion was denied prior to trial, and again denied at the commencement of the trial.

Defendant contends on appeal:

First, the trial court erred in denying defendant's motion to require the production of statements of the people's witnesses and the telephone recordings.

Second, it is not extortion to attempt to compel the payment of a debt fraudulently incurred when telephone threats of force are employed, but is merely an assault, if criminal at all.

Third, the trial court erred in admitting in evidence exhibits 7 and 8—telephone recordings not authorized by the sender.

Fourth, the evidence was insufficient to warrant the conviction of defendant of the crime of extortion.

In argument in support of his first question, the defendant contends that, in the light of what he calls the modern and more desirable trend in discovery practice and procedure, the trial judge improperly failed to grant his motion. It is his position that it is inconsistent for the courts to construe and apply the civil rules of discovery as liberally and as fairly as they do and yet apply a narrow and limited application of discovery in criminal proceedings.

Justice EDWARDS in the case of *People* v. *Johnson,* 356 Mich 619, wrote at length on the question of discovery in criminal cases. We do not feel it would be helpful to the bench and bar to restate the historical background of discovery procedure outlined by Justice EDWARDS with reference to criminal trials, but merely refer to the rule therein established. Discovery will be ordered in all criminal cases, when, in the sound discretion of the trial judge, the thing to be inspected is admissible in evidence and a failure of justice may result from its suppression. The burden of showing the trial court facts indicating that such information is necessary to a preparation of its defense and in the interests of a fair trial, and not simply a part of a fishing expedition, rests upon the moving party.

The trial judge in this case had the records played out of the hearing of the jury so as to be able to determine whether the evidence was admissible and, presumably, defendant's counsel, who was present, heard the information disclosed by the records. The same information could have been obtained on cross-examination of Janoff at the preliminary examination. No sufficient showing was made in this case to justify the granting of the broad discovery motion made by defendant.

The second error complained of by defendant. is that it is not extortion to attempt to compel the payment of a debt fraudulently incurred. In the event the debt was fraudulently incurred, the courts provide a legal and proper forum in which to determine whether or not it is fraudulent, and if so, afford a possible method of collection. The collection of a valid, enforceable debt does not permit malicious threats of injury to one's person, loved ones, or property if payment is not made. Such acts, if proven, would constitute extortion within the framework of the statute under which defendant was charged.

Defendant claims the trial court erred in admitting in evidence the telephone conversations under the theory of *Benanti* v. *United States,* 355 US 96 (78 S Ct 155, 2 L ed 2d 126). The *Benanti Case* held the prohibition against divulging unauthorized intercepted telephone messages applies to intrastate as well as to interstate messages, and any interception not authorized by the sender is in violation of the Federal communications act, and not admissible in evidence even though authorized by the State law. The Federal communications act, 47 USC (1958 ed), § 605, states in its pertinent part:

"No person not being authorized by the sender shall intercept any communication and divulge or

publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person."

Defendant further contends the ruling in *Rathbun* v. *United States,* 355 US 107 (78 S Ct 161, 2 L ed 2d 134), which permitted a peace officer to listen upon an extension phone, is not applicable because in this case there was an actual tapping of a telephone with a recording device, while in the *Rathbun Case* the police officer who listened to the conversation was using an extension telephone which had not been installed for the purpose of permitting the officer to listen, but was regular telephone equipment.

In *Schwartz* v. *Texas,* 344 US 199 (73 S Ct 232, 97 L ed 231), the United States supreme court held that evidence obtained by means of tapping was admissible in a State court where it had been obtained by State agents. Referring to the *Schwartz* decision, the supreme court in *Benanti, supra,* said (p 101):

"The rationale of that case is that despite the plain prohibition of section 605, due regard to Federal-State relations precluded the conclusion that congress intended to thwart a State rule of evidence in the absence of a clear indication to that effect."

In *Schwartz* v. *Texas, supra,* the court wrote as follows (pp 200–202):

"Petitioner contends that section 605 of the Federal communications act makes inadmissible in evidence the records of intercepted telephone conversations without the petitioner's consent. The pertinent provision of the statute reads as follows:

" 'No person not being authorized by the sender shall intercept any communication and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person.'

"Section 501 of 47 USC provides a penalty for the violation of section 605.

"We are dealing here only with the application of a Federal statute to State proceedings. Without deciding, but assuming for the purposes of this case, that the telephone communications were intercepted without being authorized by the sender within the meaning of the act, the question we have is whether these communications are barred by the Federal statute, section 605, from use as evidence in a criminal proceeding in a State court.

"We think not. Although the statute contains no reference to the admissibility of evidence obtained by wire tapping, it has been construed to render inadmissible in a court of the United States communications intercepted and sought to be divulged in violation thereof. *Nardone* v. *United States,* 302 US 379 (58 S Ct 275, 82 L ed 314), and this is true even though the communications were intrastate telephone calls. *Weiss* v. *United States,* 308 US 321, 329 (60 S Ct 269, 84 L ed 298). Although the intercepted calls would be inadmissible in a Federal court, it does not follow that such evidence is inadmissible in a State court. Indeed, evidence obtained by a State officer by means which would constitute an unlawful search and seizure under the Fourth Amendment to the Federal Constitution is nonetheless admissible in a State court, *Wolf* v. *Colorado,* 338 US 25 (69 S Ct 1359, 93 L ed 1782), while such evidence, if obtained by a Federal officer, would be clearly inadmissible in a Federal court. *Weeks* v. *United States,* 232 US 383 (34 S Ct 341, 58 L ed 652, LRA 1915B, 834, Ann Cas 1915C, 1177). The problem under section 605 is somewhat different because the introduction of the intercepted communications would itself be a violation of the statute, but in the absence of an expression by congress, this is simply an additional factor for a State to consider in formulating a rule of evidence for use in its own courts. Enforcement of the statutory prohibition in section 605 can be achieved under the penal provisions of section 501.

"This question has been many times before the State courts, and they have uniformly held that section 605 does not apply to exclude such communications from evidence in State courts. *Leon* v. *State,* 180 Md 279 (as *Hubin* v. *State,* 23 A2d 706) ; *People* v. *Stemmer,* 298 NY 728 (83 NE2d 141); *Harlem Check Cashing Corp.* v. *Bell,* 296 NY 15 (68 NE2d 854); *People* v. *Channell,* 107 Cal App2d 192 (236 P2d 654). While these cases are not controlling here, they are entitled to consideration because of the high standing of the courts from which they come."

The rule of *Schwartz* v. *Texas, supra,* also finds support in the later decisions of the Federal courts. Besides the *Benanti Case,* the rule has been recognized in *United States* v. *Gris* (CCA 2), 247 F2d 860, and *Voci* v. *Farkas* (ED Pa), 144 F Supp 103.

In 57 Mich L Rev 37, an article dealing with scientific investigation and defendants' rights contains the following statement (pp 44, 45) :

"Prior to 1934 wiretap evidence was generally admissible in State courts. At least there was no indication on the part of State appellate courts that such testimony would be improper. Since the enactment and interpretation of the Federal statute, State reaction has varied. A number of States have done nothing. A few States prohibit wiretapping and wiretap evidence in their courts. At least 2 States specifically provide for the placing of wiretaps pursuant to *ex parte* court order. The question naturally arose as to the admissibility of such evidence in State courts and the validity of State legislation which regulated or permitted wiretapping. The first question was answered by *Schwartz* v. *Texas,* in which State officers had placed taps and had been permitted to testify in a State criminal prosecution about what they overheard. Although the supreme court recognized that the officers had violated the Federal statute, it held that the rule of exclusion in Federal courts is based on the court's

control over the Federal judicial process. Lacking such power constitutionally to control State court practice, the exclusionary rule could not be applied to prohibit the use of wiretap evidence in a State court."

The recording in exact words of a voice or voices of those engaged in communicating the threats of injury to the victim by placing a recording device on the receiver's own telephone does not constitute wiretapping any more than would the listening in on an extension phone.

In *United States* v. *Yee Ping Jong*, 26 F Supp 69, the court held that it was not error to admit the recording in evidence. The court there said (p 70):

"The manner in which the conversation in question was recorded does not seem to present such an interception as is contemplated by the quoted statute. Webster's New International Dictionary defines the verb 'intercept' in part as follows: 'To take or seize by the way, or before arrival at the destined place.' The call to the defendant was made by Agent White, and the conversation between his interpreter and the defendant was not obtained by a 'tapping of the wire' between the locality of call and the locality of answer by an unauthorized person, but was, in effect, a mere recording of the conversation at one end of the line by one of the participants. It differed only in the method of recording from a transcription of a telephone conversation made by a participant. We are of opinion that the admission of the record in evidence was not error."

See the following cases where recorded conversations were admitted: *Monroe* v. *United States,* 98 App DC 228 (234 F2d 49); *Flanders* v. *United States* (CCA 6), 222 F2d 163; *Goldman* v. *United States,* 316 US 129 (62 S Ct 993, 86 L ed 1322); *Rathbun* v. *United States,* 355 US 107 (78 S Ct 161, 2 L ed 2d 134).

Judge McAllister, writing for the sixth circuit, in *Flanders* v. *United States, supra,* held that such an overhearing is not in violation of the Federal communications act, and there said (p 167):

"We are of the opinion that where, by means of an extension phone, or other device, a third party 'listens in' on a telephone conversation with the consent of one of the parties to the conversation, there is no interception of the communication, within the meaning of the statute. With respect for the high authorities that hold a contrary opinion, we are persuaded by the reasoning of those that adopt this view, and consider that the route we follow was pointed out by the supreme court in *Goldman* v. *United States, supra.*"

It seems apparent the existence of section 605 of the Federal communications act does not render inadmissible the recordings employed in this State criminal prosecution.

The defendant further claimed that the recordings were not admissible in evidence, since they were obtained in violation of CL 1948, § 750.540 (Stat Ann 1954 Rev § 28.808), which provides in part that it is a high misdemeanor for any person to "tap or make any connection with  *  *  *  telephone instruments."

The California court, interpreting a California statute very similar to the Michigan wiretap statute, has had the question before it on numerous occasions whether the introduction of evidence obtained by recordings in a manner similar to that in this case constitutes a violation of its State penal statute. That court has uniformly held it does not, and has admitted the recordings as evidence. *People* v. *Malotte,* 46 Cal2d 59 (292 P2d 517); *People* v. *Cahan,* 141 Cal App2d 891 (297 P2d 715); *People* v. *Lawrence,* 149 Cal App2d 435 (308 P2d 821); *People* v. *Dement,* 48 Cal2d 600 (311 P2d 505).

The recordings in this case were not obtained in violation of the Michigan statute and consequently were admissible in evidence under the above cited authorities.

We find no error in the trial court admitting these recordings in evidence, after having observed the usual precaution of having them played out of the presence of the jury so that the court could rule on any objections raised by defendant before the jury heard the recordings.

The fourth claim of error on the part of defendant was that the evidence was insufficient to warrant the conviction of this defendant of the crime of extortion. It is the Court's considered opinion that the evidence produced in this cause was sufficient from which the jury could find that it was the intent of the defendant to extort money from another and was sufficient to sustain the guilty verdict.

We therefore affirm the conviction.

DETHMERS, C. J., and CARR, KELLY, SMITH, BLACK, and EDWARDS, JJ., concurred.

SOURIS, J., took no part in the decision of this case.