## PEOPLE v BERTHIAUME

1. HOMICIDE—DEGREE OF GUILT—QUESTION OF FACT—TRIER OF FACT.

    The degree of guilt of an accused in a homicide case is a fact question for the trier of fact to be determined under the following established principles: (1) premeditation can be reasonably inferred from the circumstances surrounding the killing, (2) a defendant may not be found guilty of first-degree murder if he did not have an opportunity to subject the nature of his response to a second look or reflection, *i.e.,* one cannot instantaneously premeditate a murder, (3) a sufficient time lapse to provide an opportunity for a "second look" may be merely seconds, or minutes, or hours, or more, dependent on the totality of the circumstances surrounding the killing, and (4) where it is factually clear that there is no evidence of premeditation, the trier of fact may not consider a charge of first-degree murder.

2. JURY—EVIDENCE—EXCULPATORY STATEMENTS—BELIEF OF EVIDENCE.

    A jury is not obligated to believe a defendant's exculpatory explanations and may give whatever weight to any particular testimony they desire.

3. CRIMINAL LAW—EVIDENCE—ELEMENTS OF CRIME—PROOFS—INFERENCE OF GUILT—JURY.

    There must be some evidence offered by the people tending to prove each element of the crime charged, and if there is none, the jury is precluded from drawing an inference of guilt.

REFERENCES FOR POINTS IN HEADNOTES

[1] 40 Am Jur 2d, Homicide § 467 *et seq.*
[2] 75 Am Jur 2d, Trial § 815.
[3] 21 Am Jur 2d, Criminal Law § 226.
[4] 40 Am Jur 2d, Homicide § 228.
    Presumption of deliberation or premeditation from the circumstances attending the killing. 96 ALR2d 1435.
[5] 40 Am Jur 2d, Homicide §§ 319, 448, 492.
[6] 75 Am Jur 2d, Trial § 192.
    Guilt of accused, propriety and effect of prosecuting attorney's argument to jury indicating his belief or knowledge as to. 50 ALR2d 766.

4. HOMICIDE—MURDER—FIRST-DEGREE MURDER—PREMEDITATION AND
   DELIBERATION—PRIOR RELATIONSHIPS—WEAPONS—IMMEDIATE
   CIRCUMSTANCES—POST-HOMICIDE CONDUCT.

   The types of evidence from which premeditation and deliberation
   may be inferred in a trial for a first-degree murder includes the
   prior relationship between the parties, whether the murder
   weapon had been acquired or positioned in preparation for the
   homicide, the immediate circumstances of the killing, and the
   defendant's post-homicide conduct.

5. HOMICIDE—MURDER—FIRST-DEGREE MURDER—PREMEDITATION—
   FLIGHT FROM SCENE—INSTRUCTIONS TO JURY—DEGREE OF MUR-
   DER—SELF-DEFENSE.

   Flight from the scene of a homicide proves only consciousness of
   guilt and a jury should not be instructed that such evidence in
   and of itself is proof of premeditation and deliberation, but the
   jury may be instructed that such evidence may properly be
   considered with other evidence to determine the degree of
   murder and whether it was done in self-defense.

6. CRIMINAL LAW—PROSECUTORS—PROSECUTOR'S STATEMENTS—GUILT
   OF ACCUSED—APPEAL AND ERROR—EVIDENCE.

   A prosecutor is not at liberty to express a personal belief in the
   guilt of the accused, but, when such a view is expressed, the
   error does not require reversal where the belief is clearly
   related to the evidence.

Appeal from Oakland, William P. Hampton, J.
Submitted Division 2 January 8, 1975, at Lansing.
(Docket No. 19403.) Decided March 11, 1975. Leave
to appeal denied, 394 Mich 788.

Joseph Berthiaume was convicted of second-de-
gree murder. Defendant appeals. Affirmed.

*Frank J. Kelley,* Attorney General, *Robert A.
Derengoski,* Solicitor General, *L. Brooks Patterson,*
Prosecuting Attorney, *Robert C. Williams,* Chief
Appellate Counsel, and *T. S. Givens,* Assistant Ap-
pellant Counsel, for the people.

*Neil H. Fink* and *N. C. Deday LaRene,* for de-
fendant on appeal.

Before: Danhof, P. J., and McGregor and D. F. Walsh, JJ.

D. F. Walsh, J. The defendant Joseph Berthiaume was tried on an open charge of murder for the killing of Ronald Poczik. The case was submitted to a jury with instructions allowing a verdict of murder in the first degree[1], second degree[2], manslaughter[3] or not guilty.

On January 15, 1973, the jury found the defendant guilty of second-degree murder, and he was sentenced to a term in prison of from 30 to 60 years. This appeal is by leave granted from the trial court's denial of a motion for a new trial.

The facts stated in a light most favorable to the state[4] are these. On November 6, 1972, the deceased Ronald Poczik was cooperating with the Federal Bureau of Investigation in setting up a weapons exchange between himself and defendant.[5] The two men had been co-workers, acquainted for about a year, and had discussed the subject of weapons on several occasions while at work.

During one such conversation Poczik indicated that he had ready access to a variety of automatic weapons. The defendant testified that Poczik's touting of his own ability to secure weapons led him to fabricate the existence of a cache of buried hand grenades which could be traded for Poczik's weapons.

The weapons transfer was to take place on November 6, 1972, and on that afternoon defendant and Poczik each drove their vehicles to a

---

[1] MCLA 750.316; MSA 28.548.

[2] MCLA 750.317; MSA 28.549.

[3] MCLA 750.321; MSA 28.553.

[4] *People v Watkins,* 388 Mich 717, 722; 202 NW2d 780 (1972).

[5] The deceased was not a paid informant.

shopping center parking lot in the Southfield area and from there left in defendant's VW Camper for the Bald Mountain Recreation Area. Poczik had met earlier that afternoon with an FBI agent who had searched him and followed him as far as the shopping center. Both defendant and Poczik were under FBI surveillance as they entered the organizational campsite area at Bald Mountain at approximately 4:40 p.m.

The events from that point up until the arrest of the defendant were recounted solely by the defendant himself, who testified in his own behalf. The defense was self-defense. According to that testimony defendant and Poczik hiked into the woods, taking a 20-gauge shotgun, skeet thrower, and a bag of shotgun shells as a kind of "cover", in case their presence was questioned by officials. Defendant went through the motions of looking for the grenades for a while but did not disclose to Poczik that there were no grenades until they had given up the search and were returning to the car.

According to defendant, Poczik became furious upon learning he had been the butt of a practical joke and began kicking the defendant, who turned away and ran toward the van. The shotgun was slung over defendant's shoulder. It was unloaded. After Poczik caught up with him and continued hitting him, the defendant, still on the run toward the van, unslung the shotgun and loaded it.

While the two men wrestled momentarily for the shotgun, the defendant was struck again and knocked down. He got back on his feet and tried to avert further physical contact by pointing the gun at Poczik and warning him not to move any closer. While Poczik was in a crouched position approximately five to ten feet away from the defendant he made a lateral movement, which was his last,

because at that instant the defendant pulled the trigger twice. Poczik's death was immediate—caused by a large wound to the right side of the face.

Defendant then dragged the deceased's body a short distance into the brush, removed a shovel from the van and partially covered a pool of blood with dirt.

Special Agent Robert N. Fitzpatrick testified that the defendant was spotted at about 8:30 that evening driving his van in an erratic fashion and in a southerly direction from the park. He pulled over on a side street in Birmingham—on his own accord—and was seen by FBI agents moving things about the interior of the van.

Fitzpatrick then exited his vehicle, approached the van and opened the front door on the passenger's side. He identified himself, ordered the defendant out of the van and asked him his name. Special Agent Roach testified that he immediately inquired of Berthiaume: "Where's your buddy?" The defendant replied: "I hurt him bad. He's in the park. He's in the woods. I shot him."

Defendant was placed in a Bureau vehicle and advised of his rights. His van was then searched for weapons. Agent Fitzpatrick recovered an unloaded double barrel shotgun from behind the passenger's seat. He removed the weapon from its case, examined the breech, broke it, and detected a strong odor of gun powder, indicating that the weapon had been recently fired. One of the other agents searched the defendant and recovered the victim's operators license, car keys, and two spent 20-gauge shotgun shells.

The first, and most critical, issue raised by defendant is whether there was sufficient evidence presented on the element of premeditation to jus-

tify submitting the case to the jury with instructions on first-degree murder. This issue has been considered by this Court and by the Michigan Supreme Court on numerous occasions in recent years.[6] Emerging from these cases is a reaffirmation of the following well established principles:

"(1) Premeditation can be reasonably inferred from the circumstances surrounding the killing;

"(2) a defendant may not be found guilty of first-degree murder if he did not have an opportunity to subject the nature of his response to a second look or reflection, *i.e.,* one cannot instantaneously premeditate a murder;

"(3) a sufficient time lapse to provide an opportunity for a 'second look' may be merely seconds, or minutes, or hours, or more, dependent on the totality of the circumstances surrounding the killing;

"(4) where it is factually clear that there is *no* evidence of premeditation the trier of fact may not consider a charge of first degree murder." *People v Meier,* 47 Mich App 179, 191–192; 209 NW2d 311 (1973). (Emphasis in original.)

In light of these principles we must determine (1) whether taking the evidence in a light most favorable to the state, there was *any* evidence from which a jury could reasonably infer premeditation and (2) whether there was sufficient time to allow the defendant an opportunity for a "second look" prior to the shooting.

Relative to the first inquiry we point out the following uncontroverted facts: The defendant drove the victim in his own (defendant's) vehicle to

---

[6] *See, e.g., People v Vertin,* 56 Mich App 669; 224 NW2d 705 (1974), *People v Gill,* 43 Mich App 598; 204 NW2d 699 (1972), *lv den* 389 Mich 785 (1973), *People v Meier,* 47 Mich App 179; 209 NW2d 311 (1973), *People v Horn,* 41 Mich App 755; 201 NW2d 107 (1972), *People v Watkins,* fn 4, *supra, People v Morrin,* 31 Mich App 301; 187 NW2d 434 (1971), *lv den* 385 Mich 775 (1971).

a secluded spot in a state park shortly before nightfall. He brought along a 20-gauge shotgun and ammunition which he took with him when he entered the woods with the victim. While in the woods the defendant shot the victim in the head causing his death and then dragged the body into the brush and attempted to cover the blood with dirt. When arrested, the defendant had in his possession the victim's car keys and operators license.

It is our opinion that these are facts from which premeditation can reasonably be inferred.

The defendant had his own exculpatory explanations for this entire chain of circumstances; but a jury is not obligated to believe a witness's testimony *in toto*. "[T]hey may give whatever weight to any particular testimony they desire." *People v Renno,* 392 Mich 45, 60; 219 NW2d 422 (1974). *Cf. People v Ballenberger,* 51 Mich App 353, 356; 214 NW2d 742 (1974), *People v Gray,* 23 Mich App 139; 178 NW2d 172 (1970).[7]

The question of the sufficiency of the time lapse required for premeditation could have been resolved by considering the defendant's own testimony. The time sequence established therein could suggest to a jury that Berthiaume had sufficient time during the quarrel to take a second look,

---

[7] We are urged by defendant to consider a statement made by Judge LEVIN in *People v Morrin, supra,* fn 6, to the effect that a defendant's own exculpatory testimony, if disbelieved by the jury, cannot be used to fill an evidentiary gap in the people's case-in-chief. That is not what occurred in the instant case. And, at any rate, this is really another way of stating the well-established rule that there must be *some* evidence offered by the people tending to prove each element of the crime charged. If there is *none,* then the jury is precluded from drawing an inference of guilt.

Furthermore, to say that premeditation may properly be inferred from the improbability of a defendant's testimony, *People v Wolf,* 95 Mich 625, 629; 55 NW 357 (1893), is to recognize the very basic reality that a witness's credibility is always an issue at trial. *Cf. People v Morrin, supra.*

consider his alternatives and premeditate the killing of the deceased. There were three separate confrontations, according to the defendant, and enough time between the first two to unsling, load and release the safety on his shotgun.[8] Moreover, the defendant—at two distinct times during the affray—warned his victim "not to come near me, to attempt to touch me, or come any closer".[9] At one point the defendant candidly stated that Poczik "didn't believe I was going to shoot him". We find that a jury could have determined the defendant had time to "think about beforehand" the shooting of the deceased. See *People v Meier, supra.* See also *People v Vertin,* 56 Mich App 669, 679; 224 NW2d 705 (1974), upholding a first-degree murder conviction where the court found "there was adequate time even before, and certainly between the blows to the head and the gunshot wounds, for the defendant to premeditate, deliberate and take a second look".

The cases of *People v Gill,* 43 Mich App 598; 204 NW2d 699 (1972), and *People v Morrin,* 31 Mich App 301; 187 NW2d 434 (1971), are relied on

---

[8] An identification unit technician attached to the Oakland County Sheriff's Department testified that this particular shotgun had a safety mechanism which went on automatically when loaded and which prevented firing until the safety button was pushed to the off position.

[9] An excerpt from defendant's trial testimony follows:

"A. *(by defendant):* He was coming up behind me and I, well, I don't know if its right to say but I thought he was going to catch up with me again, so I turned around. I didn't believe at the time I could reach the van. So I turned around and attempted to do the same thing again, I pointed the shotgun at him. I told him not to come near me, to attempt to touch me, or come any closer and he started to do it again, to come closer. He didn't laugh this time. I can't recall what he said, but as he was coming closer it was dark. I couldn't see that well. My eyes were watering. My glasses were almost falling off and he started to turn sideways as he was and I was holding the gun at hip level when he started to turn and I fired then.

"Q. *(by defense counsel):* Yes, how many times did you fire?

"A. Twice."

heavily by defendant in advancing his view that evidence of premeditation was lacking in the instant case. He argues that the proofs submitted at trial were similar in kind to those in *Morrin* and similar in quantity to those presented in *Gill.*

The *Morrin* case is instructive in explicating the types of evidence from which premeditation and deliberation may be inferred. Considerations include the prior relationship between the parties, whether the murder weapon had been acquired or positioned in preparation for the homicide, the immediate circumstances of the killing and the defendant's post-homicide conduct.

Morrin's first-degree murder conviction was reversed because a panel of this court found there was no evidence of premeditation. The victim in that case was a hitchhiker previously unknown to the defendant. Morrin claimed that he killed the man in self-defense with a pair of tongs (a tool of defendant's trade customarily kept in his automobile) after the victim had threatened him with a knife to perform an act of oral sex.[10]

Berthiaume's conviction rests on dissimilar evidence. The murder weapon used to kill Poczik was not a tool of defendant's trade. It was a shotgun, owned by the defendant and taken by him into the woods where he killed the victim. No evidence was offered in *Morrin* which would support an inference that the victim had been transported to the secluded location for a criminal purpose. Whereas such an inference could have been drawn in the instant case. Morrin's post-homicide behavior was not at all suggestive of a premeditated plan or scheme (He had gone straight home and told his

---

[10] Both Morrin and Berthiaume testified that their victims had been armed, but in neither case was the victim's alleged weapon recovered at the scene of the crime.

wife and his sister, revisited the scene and was arrested the following day prior to turning himself in.) Berthiaume's conduct—in attempting to conceal the body and cover the blood—was significantly different and may suggest something more than mere consciousness of guilt.

The *Gill* decision reversed a second-degree murder conviction because the jury had been improperly instructed to consider the higher offense. The only evidence allowing an inference of premeditation, said the Court, was testimony that certain threats were made by Gill prior to a prison fight. These were not considered "reliable evidence of planning activity". *People v Gill, supra,* at 605.

What was missing in *Gill* was sufficient proof of a time lapse between the threat and the altercation resulting in death where the defendant could have had an opportunity for that cool, dispassionate reflection which is premeditation. Here the defendant's testimony relative to the sequence of events immediately prior to the killing establishes a time lapse sufficient for premeditation.

We conclude that there were circumstances present in the instant case from which premeditation could reasonably be inferred, and that the charge of murder in the first degree was therefore properly submitted to the jury.

The defendant's next contention is that the trial court erred in instructing the jury that it could consider evidence of flight and concealment in determining the guilt of the accused, citing *People v Cismadija,* 167 Mich 210; 132 NW 489 (1911), and *People v Morrin,* 31 Mich App 301, 332, fn 53; 187 NW2d 434, 451 (1971). The court called the jury's attention to evidence tending to show that defendant dragged the deceased's body into the brush after the shooting, that he attempted to

cover the pool of blood, left the scene and failed to report the incident to the police at the first opportunity. The trial court continued:

> "[Y]ou are instructed that you may consider these items of evidence in determining whether the killing of Ronald Poczik was done by the defendant wrongfully or whether it was done in self-defense. If you should determine that the defendant killed Ronald Poczik wrongfully, then you may consider these items of evidence in determining whether the killing was murder in the first degree, murder in the second degree or manslaughter.
>
> "None of these items of evidence in and of themselves are conclusive evidence of guilt but all or any may be considered along with all of the other circumstances of the case in determining whether the killing of Ronald Poczik by the defendant was done unlawfully or in self-defense."

Defendant acknowledges trial counsel's failure to object to the proffered instruction but maintains that it was misleading and since it was pertinent to a material matter, a new trial is required nontheless. See *People v Paxton,* 47 Mich App 144, 149; 209 NW2d 251 (1973), and *People v Liggett,* 378 Mich 706, 714; 148 NW2d 784 (1967).

We have no quarrel with the proposition that flight from the scene of a homicide proves only consciousness of guilt and a jury should not be instructed that such evidence, in and of itself, is proof of premeditation and deliberation. See *People v Cismadija* and *People v Morrin, supra.*

But in the instant case the trial judge included flight from the scene as one of "these items" of evidence to be considered in determining the degree of murder and whether it was done in self-defense. The other "items" referred to the immediate post-homicide behavior of the defendant in

throwing sand on the blood and dragging the body into the brush. This type of evidence is properly considered by a jury in determining the issue of premeditation. See *People v Meier,* 47 Mich App 179, 188; 209 NW2d 311 (1973), and *People v Morrin,* supra, at 332.

Including flight from the scene among these items—especially in light of the cautionary nature of the last quoted sentence of the instruction—did not result in manifest injustice to the defendant and was not reversible error. *People v Branner,* 53 Mich App 541, 545; 220 NW2d 183 (1974).

Defendant complains that the following remark made by the prosecutor in his closing argument, combined with the trial court's subsequent refusal to give a curative instruction, resulted in prejudicial error requiring a new trial:

"First I am going to tell you what I believe happened. It is my belief and not evidence. And why I believe it happened. I believe in this that you can find as jurors, based on the evidence in this case, based on the photographs which are admitted, based on the nature of the wound, a shot in the right cheek exiting out the left cheek, that it was not a killing done in self defense but was in fact what is properly called cold-blooded murder."

The jury was immediately excused and defense counsel's objection to the above statement was sustained on the ground that the prosecutor had improperly expressed his personal belief in the guilt of the accused. See *People v Humphreys,* 24 Mich App 411, 414; 180 NW2d 328 (1970).

The Court declined a request to give an immediate curative instruction to the jury but his final charge did contain an admonition to the effect that counsel's statements were not to be regarded as evidence.

When the jury returned, the prosecutor continued:

"I believe the evidence is such that you as jurors may find the following facts to have occurred."

Certainly a prosecutor is not at liberty to express a personal belief in the guilt of the accused. *People v Quick,* 58 Mich 321; 25 NW 302 (1885), *People v Hill,* 258 Mich 79; 241 NW 873 (1932). But the error does not require reversal when the belief is clearly related to the evidence. *People v Humphreys* and *People v Hill, supra,* cited by the defendant, are in accord with this view.

Unlike the instant remark most of those complained of in the cases cited in defendant's brief (including the venerable *People v Quick, supra)* did not invite the attention of the jury to the evidence produced at trial. As such, the remark was not so prejudicial as to require reversal. *People v Allen,* 39 Mich App 483, 492; 197 NW2d 874 (1972), *reversed on other grounds,* 390 Mich 383; 212 NW2d 21 (1973).

We have considered the defendant's final contention that his trial counsel committed mistakes so serious that he was denied a fair trial.

The argument is not persuasive and requires no further discussion.

Defendant's conviction is affirmed.