PEOPLE v JESSE SMITH

1. Criminal Law—Discovery—Exclusion of Discovery—Court
   Rules.

   The application of discovery rules is expressly excluded in crimi-
   nal cases by court rule (GCR 1963, 785.1[2]).

2. Criminal Law—Discovery—Judge's Discretion—Burden of
   Showing Specific Facts—Fishing Expedition.

   Discovery will be ordered in a criminal case, when, in the sound
   discretion of the trial judge, the thing to be inspected is
   admissible in evidence and a failure of justice may result from
   its suppression; the burden of showing the trial court facts
   indicating that such information is necessary to a preparation
   of its defense and in the interests of a fair trial, and not simply
   a part of a fishing expedition, rests upon the moving party.

3. Criminal Law—Discovery—Judge's Discretion—Opportunity of
   Cross-Examination.

   Generally, a trial court's denial of criminal discovery is not
   reversible error if the defendant is afforded full opportunity of
   cross-examination.

References for Points in Headnotes
[1] 23 Am Jur 2d, Deposition and Discovery § 307 *et. seq.*
[2] 23 Am Jur 2d, Depositions and Discovery §§ 314–324.
[3] 23 Am Jur 2d, Depositions and Discovery §§ 308, 313.
[4] 40 Am Jur 2d, Homicide §§ 470–472, 479.
   Homicide: presumption of deliberation or premeditation from the
   circumstances attending the killing. 92 ALR2d 1435.
[5, 7] 40 Am Jur 2d, Homicide §§ 263–269.
   Inference of malice or intent to kill where killing is by blow
   without weapon. 22 ALR2d 854.
   Homicide: presumption of deliberation or premeditation from the
   fact of killing. 86 ALR2d 611.
   Homicide: presumption of deliberation or premeditation from the
   circumstances attending the killing. 96 ALR2d 1435.
[6] 30 Am Jur 2d, Evidence §§ 1080–1088.
   Credibility of witness giving uncontradicted testimony as matter for
   court or jury. 62 ALR2d 1191.

4. Homicide—Degree of Guilt—Questions of Fact.

    A determination of the degree of guilt of one accused of homicide is a fact question for the trier of fact under established principles: (1) premeditation can be reasonably inferred from the circumstances surrounding the killing, (2) a defendant may not be found guilty of first-degree murder if he did not have an opportunity to subject the nature of his response to a second look or reflection, *i.e.,* one cannot instantaneously premeditate a murder, (3) a sufficient time lapse to provide an opportunity for a "second look" may be merely seconds, or minutes, or hours, or more, dependent on the totality of the circumstances surrounding the killing, and (4) where it is factually clear that there is no evidence of premeditation, the trier of fact may not consider a charge of first-degree murder.

5. Homicide—First-Degree Murder—Premeditation—Circumstances—Inferences.

    Premeditation can be inferred from various kinds of evidence, such as the prior relationships between the parties, whether the murder weapon had been acquired or positioned in preparation for the homicide, the immediate circumstances of the killing, and the defendant's post-homicide conduct.

6. Jury—Witnesses—Evidence—Weight.

    A jury is not obligated to believe a witness's testimony *in toto,* they may give whatever weight to any particular testimony they desire.

7. Criminal Law—Evidence—First-Degree Murder—Premeditation—Proof of Guilt—Reasonable Doubt—Jury—Verdict of Guilty.

    A jury's verdict of guilty of first-degree murder should not be disturbed where there was sufficient evidence on the homicide and also evidence to allow a reasonable man to infer premeditation beyond a reasonable doubt.

Appeal from Oakland, Frederick C. Ziem, J. Submitted January 3, 1978, at Lansing. (Docket No. 31393.) Decided February 6, 1978.

Jesse R. Smith was convicted of first-degree murder. Defendant appeals. Affirmed.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *L. Brooks Patterson,*

Prosecuting Attorney, *Robert C. Williams,* Chief Appellate Counsel, and *James L. McCarthy,* Assistant Appellate Counsel, for the people.

*Monash & Moss, P. C.,* for defendant on appeal.

Before: V. J. Brennan, P. J., and D. E. Holbrook and R. B. Martin,* JJ.

D. E. Holbrook, J. Defendant was charged with open murder in the homicide of one Freelin Miller, contrary to MCLA 750.316; MSA 28.548. The homicide was the result of a shooting that took place in an automobile in Oakland County on November 27, 1975. On August 6, 1976, a jury found defendant guilty of first-degree murder and he was subsequently sentenced to life imprisonment. On appeal defendant raises two issues.

Because of its bearing on the issues raised in this appeal, an extended recitation of the facts is necessary.

Oliver Honchel[1] and Freelin Miller were serving time for manslaughter at a prison parole camp. The two men were very good friends and on Thanksgiving Day, November 27, 1975, they began drinking some vodka that had been smuggled into the prison camp. They started drinking around 7 a.m. and by 2 p.m. had consumed two pints of vodka. On the spur of the moment, they decided to take a camp truck and escape from the prison camp.

They drove to Detroit where they abandoned the vehicle and went to a bar in order to call Oliver's

---

* Circuit judge, sitting on the Court of Appeals by assignment.

[1] At the time of this escape Oliver was serving a sentence for manslaughter wherein he bludgeoned his brother Orville to death in 1967 and had also served time for attempted jail break, armed robbery, and breaking and entering.

brother Calvin.[2] Calvin was home watching a football game when he received his brother's call around 4 or 5 p.m. Oliver told him that he and a friend had run away from the prison camp and wanted Calvin to help them. While waiting for Calvin to pick them up, Oliver and Freelin had a drink and when Calvin arrived, the three of them had a couple more drinks.

Oliver and Freelin needed some money so Calvin agreed to drive them to Pontiac where Freelin could get some money. However, Calvin did not have enough money for gas so he went to see Jesse Smith, a very good friend of his, in order to inquire if he could borrow some money. Calvin explained to Jesse that Oliver and Freelin had escaped and they needed some money for gasoline. The men sat down in Jesse's apartment and had a few drinks. Because Oliver and Freelin were still wearing their prison clothes, Jesse gave them a change of clothing.

Calvin asked Jesse if he wanted to go along with them on the ride to Pontiac. Both Jesse and his wife decided to go. Calvin's Pinto was too small for the group so they took Jesse's Cadillac. As they were leaving the apartment, Calvin asked Jesse if he was carrying his gun. Jesse said, "no", and then told Calvin that the gun was in his bedroom. Calvin went into Jesse's bedroom and, taking the gun, placed it in the waistband of his pants. Calvin testified that he wanted the gun for security in case they were stopped by the police. Everyone then got into the car and they left for Pontiac. Calvin drove because Jesse did not have a driver's license.

Before entering the I-75 freeway, they stopped

---

[2] Calvin had two previous felonies, second-degree murder and aggravated assault for shooting one of his brothers in the leg.

and Jesse's wife bought a six-pack of beer. After
they left the store, Jesse's wife sat between Calvin
and Jesse in the front seat and Freelin sat behind
Calvin in the back seat and Oliver sat behind
Jesse in the back seat. As they drove down I-75,
Calvin testified that Freelin began to get shaky.
By this he meant that Freelin was worried about
who was going to take responsibility for stealing
the vehicle that they used in their escape. Freelin
did not know whether he or Oliver should take the
blame. Calvin stated that listening to Freelin and
Oliver argue made him very nervous.

Calvin pulled the car off the freeway at Adams
Road so the men could get out of the car and
relieve themselves. Jesse and Calvin stood on the
driver's side toward the back of the car and Oliver
and Freelin stood on the other side of the car.
They were outside the car for approximately five
minutes.

Calvin testified that as he and Jesse stood there,
Calvin told Jesse that he felt like killing Freelin.
Calvin stated that he was thinking out loud and
made the statement because Freelin was getting
on his nerves. Calvin testified that Jesse told him
not to worry about it and Calvin thought that
Jesse was merely trying to calm him down. Calvin
said that he did not actually intend to kill Freelin.

The men got back into the car and sat in the
same places that they had been sitting in previ-
ously. Calvin testified that he proceeded to turn
the car around and as he was doing this, Jesse
reached around his wife and motioned for the gun.
Calvin stated that he raised up and Jesse took the
gun from Calvin's waistband. Calvin testified that
within one or two seconds from the time Jesse
took the gun from his waistband, he heard an
explosion. At this time Calvin looked over at Jesse

and saw the gun in Jesse's hand pointed toward the floor of the car. Calvin stopped the car and Jesse requested that he help him get the body out of the back seat. Jesse opened the car door and dragged Freelin out of the car and into a ditch where he was left. Calvin stated at trial that he thought Jesse took the gun from him to prevent Calvin from using it.

Oliver testified that because of all the liquor he had drunk, he was unable to remember leaving Jesse's apartment, riding in the car or relieving himself. All he remembered was hearing an explosion and feeling Freelin fall on his knee. The next thing he recalled was waking up the following morning.

Jesse's wife testified for the defense and stated that after the men relieved themselves they got back into the car and Calvin drove a short distance and stopped. She stated that she was pushed forward and heard a shot. She thought the shot occurred within one or two minutes after the car came to a stop. She also testified that it was a matter of seconds between when she went forward and when she heard the shot. Immediately after the shot was fired she looked in the back seat. She then looked at her husband and saw that he had a gun in his hand. Contrary to Calvin's testimony, she stated that her husband did not reach in front of her and that nothing passed between Calvin and her husband. She testified that as to any motive her husband had to shoot Freelin was, "the only possible reason was to protect myself, and the rest, because he was afraid of something happening to me".

After the body was dumped into the ditch, Calvin drove the group to Detroit where they stopped at three different bars. Later, Jesse's wife drove

Calvin and Oliver back to Calvin's car. She testified that Calvin told her that she better not say anything or "he would dig a new well".

Jesse Smith[3] took the stand in his own behalf and testified that as they were relieving themselves, Calvin said, " 'We got to get rid of this guy.' " Jesse said, " 'We can leave him at the bar.' " Calvin said, " 'No, we got to get rid of him.' " After the men relieved themselves, Jesse said that Calvin drove down the road about 200 feet and pulled into a driveway where he then backed out onto the road and started to drive down it. Jesse said that the headlights went out on the car and he turned toward Calvin and noticed that Calvin was stopping the car. He also saw that Calvin was turning toward the back seat with a gun in his hand. Jesse testified that he grabbed his wife and pushed her down and with his other hand went to grab the gun. Jesse stated that the gun went off just as he was about to grab it and the gun ended up in his hand.

The next day Jesse was arrested and the gun was seized from him. The arresting officer stated that Jesse pulled the gun on him, but Jesse denied this and said the policeman was lying. When the police questioned Jesse about whether or not he had seen Calvin within the last few weeks, Jesse stated that he had not. Jesse admitted at trial that he had lied to the officers when they questioned him because Calvin was such a good friend and he wanted to protect him.

The next day after the homicide Calvin left for California where he was arrested and extradited back to Michigan. Calvin's murder charge was reduced to harbouring a fugitive in return for his testimony at trial.

---

[3] He had prior convictions for possession of a firearm and larceny from a person.

On appeal, defendant brings two allegations of error. We deal with them in order.

The first issue raised by defendant is that the trial court abused its discretion in denying the defendant's motion for discovery of a pretrial statement made to the prosecutor by defendant's wife, a res gestae witness. In support of this issue, defendant contends that the trial court's refusal to order discovery of the statement resulted in a failure of justice because defendant needed to review the statement in order to determine whether to invoke his privilege and bar defendant's wife from testifying.

GCR 1963, 785.1(2) expressly excludes the application of discovery rules in criminal cases. In *People v Maranian,* 359 Mich 361, 368; 102 NW2d 568 (1960), the Michigan Supreme Court stated the rule of discovery in criminal cases as follows:

"Discovery will be ordered in all criminal cases, when, in the sound discretion of the trial judge, the thing to be inspected is admissible in evidence and a failure of justice may result from its suppression. The burden of showing the trial court facts indicating that such information is necessary to a preparation of its defense and in the interests of a fair trial, and not simply a part of a fishing expedition, rests upon the moving party."

Defendant, in his motion for discovery, stated:

"3. That the Prosecution has indicated that there are three (3) potential Res Gestae Witnesses, including the defendant's wife, who could possibly give testimony at the time of trial and further, the defendant believes that said Witnesses have given statements to the investigating law enforcement agency prior to this time.

"4. That the defendant desires to obtain copies of any handwritten, typed or taped statements obtained during the investigation of this matter."

The Michigan Supreme Court has stated that the defense carries the burden of showing to the trial court *specific facts* " 'indicating that such information is necessary to a preparation of its defense and in the interests of a fair trial, and not simply a part of a fishing expedition'. *Maranian, supra,* at 368." *People v Nkomo,* 75 Mich App 71, 76; 254 NW2d 657 (1977). Defendant in his motion for discovery did not set forth any specific facts or information which it expected to glean from the statement.

In addition, this Court does not feel that the denial by the trial court of defendant's motion resulted in prejudicial error. Generally, a trial court's denial of criminal discovery is not reversible if, as in the instant case, defendant is afforded full opportunity of cross-examination. *People v Bell,* 74 Mich App 270, 275; 253 NW2d 726 (1977). During the trial of the case at bar, defense counsel was given a copy of defendant's wife's statement to police. The judge granted a recess to allow defense counsel an opportunity to study and review the statement. Defense counsel then used the statement in his cross-examination of the police officer who had taken the statement from defendant's wife. Defense counsel also used the statement in his direct and redirect examination of defendant's wife. Defendant's argument that he needed the statement in order to decide whether or not to bar his wife from testifying is without merit in light of the fact that defendant called his wife to testify after having the opportunity to review the statement.

After an examination of the facts, we hold that the trial judge did not abuse his discretion in denying defendant's pretrial discovery motion.

Next, defendant contends that the trial court

record lacks sufficient evidence of a "second look" from which premeditation and deliberation could have been properly inferred. In dealing with this issue, we turn to our opinion in *People v Meier,* 47 Mich App 179, 191–192; 209 NW2d 311 (1973).

"Our own answer to the question of the appropriate rule to follow as to what constitutes premeditation in a first-degree murder case is not a definition. Rather, it is a reaffirmation of the role of the trier of fact in deciding the degree of guilt of an accused under the following established principles:

"(1) Premeditation can be reasonably inferred from the circumstances surrounding the killing;

"(2) A defendant may not be found guilty of first-degree murder if he did not have an opportunity to subject the nature of his response to a second look or refelction, *i.e.,* one cannot instantaneously premeditate a murder;

"(3) A sufficient time lapse to provide an opportunity for a 'second look' may be merely seconds, or minutes, or hours, or more, dependent on the totality of the circumstances surrounding the killing;

"(4) Where it is factually clear that there is *no* evidence of premeditation, the trier of fact may not consider a charge of first-degree murder.

Attempting to further clarify this 'definition' in the past has, we believe, led to an invasion by the appellate courts into areas rightfully left to the trial court in its fact-finding processes." (Emphasis in original.)

See also, *People v Rappuhn,* 55 Mich App 52, 58–59; 222 NW2d 30 (1974), *People v Berthiaume,* 59 Mich App 451, 456; 229 NW2d 497 (1975), *People v Page,* 63 Mich App 177, 181; 234 NW2d 440 (1975), *lv den* 399 Mich 850 (1977).

Premeditation can be inferred from various kinds of evidence, such as the prior relationships between the parties, whether the murder weapon had been acquired or positioned in preparation for

the homicide, the immediate circumstances of the killing, and the defendant's post-homicide conduct. *People v Morrin,* 31 Mich App 301, 331–332; 187 NW2d 434 (1971), *lv den* 385 Mich 775 (1971), *People v Oster,* 67 Mich App 490, 497; 241 NW2d 260 (1976).

Keeping the foregoing principles in mind, we review some of the evidence. The defendant had his own exculpatory explanation for this entire chain of circumstances; but a jury is not obligated to believe a witness's testimony *in toto. Berthiaume, supra,* at 457. "[T]hey may give whatever weight to any particular testimony they desire." *People v Renno,* 392 Mich 45, 60; 219 NW2d 422 (1974). The jury in this case chose to disbelieve defendant's claim that the gun went off before he was able to grab Calvin Honchel's hand.

Calvin Honchel testified that as he and the defendant were relieving themselves along the roadside, he told defendant that he felt like killing Freelin Miller because he thought Freelin might implicate him in the escape. The defendant told Calvin "not to worry about it". Approximately five minutes after defendant told Miller "not to worry about it", Calvin testified that the defendant motioned to him that he wanted the gun and then reached into Calvin's waistband and removed the gun. Within one or two seconds, Calvin heard the gun discharge and saw defendant with the gun in his hand. The prosecutor argues that there was ample time between the defendant's statement "not to worry about it" and the shooting for defendant to have taken a "second look". We agree. The testimony of defendant's wife also indicates that defendant had time for a "second look". Her testimony that nothing passed between Jesse and Calvin points to the fact that defendant had the

gun prior to the car coming to a stop. She stated that the shot was fired within one or two minutes after the car came to a stop. This one or two minutes was sufficient time in which to take a "second look". There was sufficient time lapse where defendant had the opportunity for that cool, dispassionate reflection which is premeditation. *Berthiaume, supra,* at 460.

Additionally, defendant's post-homicide conduct indicates a premeditated plan. Immediately after the shooting, defendant got out of the car and told Calvin to help him get rid of the body. Defendant dragged Freelin out of the car and into a ditch where he was left. They then fled to Detroit.

Also, this Court notes that the murder weapon was a pistol and not a "tool of defendant's trade" as in *Morrin.* The pistol was owned by defendant, although Calvin had been carrying it in the waistband of his pants. Earlier, Calvin had asked defendant if he had his gun and defendant said that it was in the bedroom. Calvin went into the bedroom, got the gun, put it in his waistband and joined the others in the car. Calvin testified that defendant motioned for the gun and then reached into Calvin's waistband and removed it. Shortly thereafter, the gun was discharged and Freelin Miller was no longer able to "squeal" on anyone.

After a review of the evidence, we are persuaded that sufficient evidence was produced to support a reasonable inference of premeditation and that, therefore, the jury's finding of this fact should not be disturbed. There was sufficient evidence to allow a reasonable man to infer premeditation beyond a reasonable doubt. *People v Atley,* 392 Mich 298; 220 NW2d 465 (1974).

Affirmed.